548 S.E.2d 490 (2001)
249 Ga. App. 502
In the Interest of V.S., a child.
No. A01A0382.
Court of Appeals of Georgia.
May 7, 2001.
*491 Michael S. Moody, Marietta, Roger L. Curry, Austell, for appellant.
Thurbert E. Baker, Atty. Gen., Dennis R. Dunn, Deputy Atty. Gen., William C. Joy, Senior Asst. Atty. Gen., Shalen S. Nelson, Laura W. Hyman, Asst. Attys. Gen., Cheeley & Joyner, John P. Cheeley, Duluth, Sanders B. Deen, Marietta, for appellee.
JOHNSON, Presiding Judge.
The father of now 20-month-old V.S. appeals from the juvenile court's order terminating his parental rights. He contends that *492 there is not clear and convincing evidence of parental misconduct or inability justifying the termination of his rights. We agree and reverse.
The record shows that the father is a thirty-year-old illegal immigrant who has lived in the United States for eight years. He makes about $750 per week doing construction work, some of which he has been using to support his parents in Mexico. He currently shares an apartment with five of his male friends.
He met V.S.'s mother as a result of her coming to the apartment to have sex for money with some of his roommates. He availed himself of her services initially, but then the two began having what the father considered a serious relationship. The mother and father moved in together and cohabitated for four or five months. During that time, the mother became pregnant with V.S. The father gave the mother money so she could get prenatal care, though he is not certain whether she actually sought and received any medical care. The father asked her to marry him, but she refused. The mother was addicted to drugs, and the father, who has not used drugs or alcohol and has no criminal record, testified that he took action to stop her from using drugs while she was pregnant.
When V.S.'s mother was four months pregnant, the father moved back in with his friends. A few months later, in July 1999, V.S. was born. Upon being told of the child's birth, the father immediately went to the hospital. When asked if he signed the birth certificate, the father replied that he was not given any papers to sign, but that if he had been given the opportunity to do so, he would have. According to the father, although the mother told him the child was his, some people questioned whether that was true because the child had blond hair. The father believed the child was his, but eventually requested a paternity test to confirm that.
Shortly after V.S. was born, the hospital conducted drug tests on V.S. and her mother. Both tested positive for cocaine. The Department of Family & Children Services ("DFCS") took custody of the three-day-old child and placed her in foster care. DFCS developed a case plan for the mother, but she did not comply with its requirements. By November 1999, she was serving a six-year prison sentence on drug charges.
The father wanted to visit the child soon after DFCS took custody of her, but the mother told him that he could not do so without an appointment. Although DFCS had his name and address, it did not send him any letters or notices for four to six months. He called DFCS repeatedly in order to set up an appointment to see his daughter. DFCS' phone system, however, only allowed voice mail messaging, so he left about 15 messages. His calls were not returned, so he stopped calling. He also attempted to visit the offices but, after driving up and down the street five times, could not find the building. A caseworker admitted at the hearing that it is very difficult for clients to get calls through to the main phone number at DFCS.
In November or December 1999, the father was informed that his father was dying. He went to Mexico for two to three months to be with his parents. V.S.'s father does not speak English, and, just before he left for Mexico, he asked an interpreter to contact DFCS for him. After his father died and he remained for a short time to assist his mother, V.S.'s father returned to the United States, making sure he returned in time to attend the next hearing. Upon his return, he asked the interpreter to try to make an appointment for him to see V.S., which she did.
The father began seeing his daughter for one hour every fifteen days, the maximum amount of time he was allowed to see the child. He kept all of his scheduled appointments through the date of the hearing and, according to the caseworker, showed affection for and seemed to genuinely love V.S. In the caseworker's opinion, the father has established a bond with the child. The father had asked a DFCS caseworker about paying child support, but was told that he would not be allowed to do so; he was told that "the court hearings would decide if I could support her or not." No case plan was ever established for the father. The caseworker *493 testified that she believed that the father would follow a case plan if one was set up, that he would consistently visit and support his daughter, and that he would, as he said, immediately change his living arrangements.
In February 2000, when V.S. was seven months old, DFCS petitioned to terminate both parents' rights. The juvenile court heard the petition to terminate the mother's rights in May 2000 and granted that petition. That termination is not under consideration in this appeal.
As part of his response to the petition to terminate his parental rights, the father filed a petition to legitimate the child. The juvenile court heard both the legitimation and the termination petitions at the same time. Without ruling on the legitimation petition, the juvenile court entered an order terminating the father's parental rights. The court based its decision on the following findings: The father is an illegal alien and is subject to deportation; he has failed for more than one year to develop and maintain a parental bond with the child; he has not provided any financial support to the child; he only began visiting the child when she was nine months old; he failed to contact DFCS and went to Mexico without notifying anyone connected with this proceeding; he failed to respond to a certified letter from DFCS; he got the child's mother pregnant knowing she had a drug problem; he did nothing to stop the mother from abusing drugs; he has failed to obtain permanent employment with benefits; he has failed to obtain basic child care items, such as a car seat; and he does not have his own place to live. The juvenile court found that it was in the best interest of the child to terminate the father's rights. Although some of these facts may support a termination of parental rights, the juvenile court's termination of the father's rights in this case was premature.
1. (a) Abandonment. The record does not support the juvenile court's express and implied findings that the father abandoned his daughter.
In order to find abandonment, there must be sufficient evidence of an actual desertion and an intention to sever entirely, so far as possible, the parental relationship, throw off all obligations growing out of the relationship, and forgo all parental duties and claims.[1]
In this case, the evidence shows that the father made numerous attempts to contact DFCS in order to visit his daughter, asked if he could pay child support, gave the child's mother money for prenatal care, arranged for and kept his visitation appointments for the five-month period preceding the hearing, showed love and affection toward V.S. during visitation, and made arrangements for caring for the child should he be given custody. These facts do not demonstrate an abandonment.
(b) The father's present circumstances. The father conceded at the hearing that his current living arrangements, i.e., sharing an apartment with five other men, are not appropriate for raising a daughter. He testified, though, that his married friend and the friend's wife have offered their home to him and his daughter. The friend's sister has offered to care for V.S. while the father works. There was also evidence that the father's cousin and aunt have offered to assist the father in raising the child and that DFCS has already evaluated and approved those homes. The fact that the father's present living arrangements may not be suitable for his daughter should not form the basis for termination, since he has not been given an adequate opportunity to establish appropriate living arrangements. After all, the termination petition was filed just seven months after the child's birth and before paternity tests established that the child was his. Moreover, no plan was ever established to reunite the child with her father.
As there is no judicial determination that has more drastic significance than the permanent severance of a natural parent-child relationship, the severance of that relationship must be exercised cautiously and *494 scrutinized deliberately.... Because the termination of parental rights has a final, ultimate, and significant result, that judgment must conclusively show compliance with the statutory criteria prescribed as a condition precedent.[2]
Under OCGA § 15-11-94(b)(4)(C), where the child is not in the parent's custody, in determining whether the child is without proper parental care and control, the court shall consider, among other things, whether the parent without justifiable cause has failed significantly for a year or more prior to the filing of the termination petition: (i) to develop and maintain a parental bond with the child in a meaningful, supportive manner; (ii) to provide for the care and support of the child as required by law or judicial decree; and (iii) to comply with a court-ordered plan designed to reunite the child with her parent.
We agree with the father that there is less than clear and convincing evidence of his parental unfitness as required for termination under the statute. Only seven months passed between the child's birth and the time the termination petition was filed; the father made efforts to support the child in various ways before and after her birth; and he has bonded with her. No case plan has been devised to reunite the father with the child. The facts of this case require that a plan be established with the goal of reuniting V.S. with her father and that the father be afforded an adequate opportunity to meet the criteria set out in the plan.[3] Accordingly, the judgment of the juvenile court must be reversed and the case remanded for the implementation of a reunification plan.
2. We are not persuaded by DFCS' contention that termination was authorized because the father failed to file his legitimation petition within 30 days of being notified of the termination proceeding.[4] It is not clear from the record when the father filed the petition, since the legitimation petition is not included in the record. The record does show that the father requested and received a continuance in order to determine whether he was the child's biological father. And, even if the petition was filed late, the juvenile court did not consider the filing date to be fatal, since it did not decide to terminate parental rights based on the alleged untimeliness of the legitimation petition. In fact, the juvenile court announced at the beginning of the hearing that it would consider both petitions. Under the circumstances, we will not hold that the termination was justified based on the filing date of the legitimation petition.
On remand, we direct the juvenile court to issue a ruling on the father's petition for legitimation.
Judgment reversed and case remanded with direction.
RUFFIN and ELLINGTON, JJ., concur.
NOTES
[1] In the Interest of L.S., 244 Ga.App. 626, 536 S.E.2d 533 (2000); Spires v. Tarleton, 225 Ga. App. 117, 119(2), 483 S.E.2d 337 (1997).
[2] (Citations and punctuation omitted.) In the Interest of T.B., 242 Ga.App. 564, 565(2), 529 S.E.2d 620 (2000) (physical precedent only); see In the Interest of K.M., 240 Ga.App. 677, 679-680, 523 S.E.2d 640 (1999).
[3] See, e.g., In the Interest of R.H., 240 Ga.App. 551, 524 S.E.2d 257 (1999), where the father, an illegal alien and a convicted felon, did not lose his parental rights until after he failed to comply with the requirements of a reunification plan.
[4] See OCGA § 15-11-96(h), (i).