587 S.E.2d 825 (2003)
263 Ga. App. 353
In the Interest of M.M. et al., children.
In the Interest of A.P., a child.
Nos. A03A1174, A03A1175.
Court of Appeals of Georgia.
September 24, 2003.
*826 T. Rabb Wilkerson, III, for appellant (case no. A03A1174).
Lisa J. Allen, Apo, for appellant (case no. A03A1175).
Thurbert E. Baker, Atty. Gen., Dennis R. Dunn, Deputy Atty. Gen., William C. Joy, Senior Asst. Atty. Gen., Shalen S. Nelson, Asst. Atty. Gen., Walter G. Sammons, Jr., for appellee.
PHIPPS, Judge.
In separate appeals, the mother of M.M., H.W., and A.P. and the father of A.P. challenge the termination of their parental rights. Each contends that there was not clear and convincing evidence of parental misconduct or inability as required for termination under OCGA § 15-11-94. Because the evidence was insufficient, we reverse the mother's case, Case No. A03A1174, and the father's case, Case No. A03A1175. Their cases are consolidated in this opinion.
*827 On June 2, 1997, the mother and the biological father of A.P. were involved in a physical altercation with each other, and both were arrested. M.M., H.W., and A.P., then ages five, four, and one, respectively, were placed in the care of the Department of Family and Children Services (DFACS). Four days later, DFACS filed a deprivation petition, alleging that the children lived with their mother and A.P.'s father, that there was domestic violence in the home, and that conditions in the home were "unfit for the children[`s] ... health and safety." Later that month, the juvenile court granted DFACS's petition, and the mother entered into a reunification case plan. A reunification case plan for A.P.'s father was developed in June 1999, after he had legitimated her.
In September 1999, DFACS petitioned under OCGA § 15-11-94[1] to terminate the parental rights of the mother, A.P.'s father, and the putative fathers of M.M. and H.W. Meanwhile, DFACS's custody of the children was extended several times. After hearings in February 2000 and October 2000, the case was sent to mediation. The reunification plans for the mother and A.P.'s father were modified. After a final hearing in September 2001, the juvenile court granted DFACS's petition to terminate the parental rights.
Before a juvenile court terminates parental rights, it must undertake a two-step analysis:
First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.[2]
On appeal, we view the evidence in the light most favorable to the juvenile court's ruling and determine whether a rational trier of fact could have found by clear and convincing evidence that the parental rights should have been terminated.[3]
Case No. A03A1174
1. The reunification plan for the mother established three goals for her: (1) maintain a drug-free lifestyle, (2) meet the basic needs of her children, and (3) remain cooperative with DFACS. At the February 2000 hearing, a DFACS caseworker reported that the mother had completed the first two of three phases of a drug treatment program. The caseworker had been unable to ascertain whether the mother had completed the final phase, which was to either permit follow-up home visits or attend AA or NA meetings. However, the caseworker reported, each of the mother's drug screens, which had continued through June 1999, had been negative, and nothing indicated that she was using drugs.
The second goalmeet the basic needs of the childrenrequired the mother to complete a parenting program and "maintain stable living arrangements free of domestic violence." The caseworker testified that the mother had completed a parenting class in August 1997. Regarding the mother's living arrangements, the caseworker stated that the mother had been living in the same location for the previous eighteen months and that, based on DFACS's "informal" home evaluation, other than the two-bedroom trailer being "a little cluttered," "everything appeared to be okay." The caseworker also reported that while the mother had held several short-term jobs initially, she had been working fairly consistently since May 1999 and that she was then meeting the basic needs of her fourth and youngest child, who lived with her. DFACS presented no evidence *828 of continued domestic violence in the mother's life.
The third goalremain cooperative with DFACSrequired the mother to provide DFACS with information regarding the children as requested, contact the case manager to schedule monthly visits, and notify DFACS of any change in address and telephone number. The case manager testified that other than two missed visitations in February 2000, the mother had maintained "fairly consistent visits" with her children. The mother explained that she had missed the first visitation because of illness and the second due to transportation trouble.
Further, the caseworker reported, M.M. and H.W. were being seen by a psychologist for Attention Deficit Hyperactivity Disorder (ADHD) and for behavior problems at home and school. The caseworker recalled that in a November 1999 visit, the children were particularly active and the mother commented that she needed someone to tell her how to handle her children's behavior. The court reserved ruling on DFACS's termination petition and ordered the mother to undergo a psychological evaluation by the psychologist who had treated her children.
When the termination hearing resumed in October 2000, DFACS introduced the psychologist's diagnosis that the mother had a narcissistic personality disorder. According to the psychologist, a person with that disorder has little tolerance for authority and thus would have problems in circumstances of imposed structure, such as employment environments. The psychologist related her concern that if the children were returned to their mother, they could develop narcissistic personality disorders and thus might not learn right from wrong, perseverance, and good moral values. But, she made clear, not all individuals with narcissistic personality disorder should be stripped of their right to parent.
At that second hearing, the mother reported that she had lived in the same two-bedroom trailer for about two years and that, about three months before the hearing, she and her youngest child had moved to a larger, three-bedroom house. The DFACS caseworker had not visited the house. The mother also reported that she had been terminated the previous month from a job for which she had been hired as temporary help, but that she had since started a business cleaning homes. The DFACS caseworker was aware that the mother had undergone periods of unemployment and stated that the mother had informed her that she had obtained a van to alleviate her transportation problems. DFACS presented no evidence that the mother had been using drugs and no evidence of domestic violence. The guardian ad litem stated that he believed that reunification, rather than termination, was the best course.
In November 2000, the court referred the case to mediation. A modified reunification plan was developed, wherein the mother agreed to (1) attend ten counseling sessions and receive education on ADHD; (2) remain in a stable living arrangement for a minimum of six months; (3) find employment or enroll in job training within six months of the mediation; (4) attend visits with her children, scheduled every other Thursday between 3:30 and 5:00 p.m.; and (5) pursue overnight visits by completing the other steps.
In September 2001, the termination hearing resumed before the juvenile court. The mother had completed ten counseling sessions. She had received training on ADHD. She reported that in February 2001, she had moved to a three-bedroom, two-bathroom double-wide trailer, where she lived with her boyfriend and her fourth child, then three years old. The lease was in her name, and there was sufficient room for M.M., H.W., and A.P. to live there. She had reported her move to DFACS and had asked the department to visit her new home. DFACS had not done so.
The mother and her boyfriend had been living together for about a year. Her boyfriend was from Mexico and admitted that he had not entered the United States legally. He was employed on an air force base doing roofing work and financially supported the mother and her fourth child. He had accompanied the mother to visit M.M., H.W., and A.P. and testified that he wanted to marry the mother and would welcome the three children into their home.
*829 A DFACS caseworker reported that during visitations, the children had fought for their mother's attention. Therefore, in February 2000, the schedule was changed so that the mother would visit one child on Tuesdays and the other two children on Thursdays, every other week. The DFACS caseworker reported that the mother had missed only one scheduled visit and that the visits had gone smoothly. DFACS had not considered overnight visitation, however, because it had determined that the mother had failed to comply with the employment and job training requirements of her reunification plan.
The mother testified that since the December 2000 mediation, she had been preparing and selling food from her home, making approximately $150 each week. In January and February, she had applied for various jobs, but received no employment offers. In March, she began working for a contractor on an air force base as a Spanish translator. That job terminated after about three weeks, when interpreting was no longer needed. Her next job lasted about a month, ending the first of May because she had missed too many days. She also worked for a contractor, cleaning newly constructed houses on an air force base. That job ended after two or three weeks for the same reason. The mother explained that the missed days were due to her visitation schedule. She testified, "I wasn't going to miss my visits because they're very important to me and I know it's important that the Court sees that I'm trying to make meaningful visits with my children, so I was trying not to miss any of my visits." Since the job at the air force base, the mother had been searching for employment that would allow her to attend afternoon visits with her children.
The guardian ad litem opposed termination, stating "I'm not sure she can keep a job, but then there's a lot of people that can't keep a job either, but their children aren't taken away from them."
The juvenile court terminated the mother's parental rights to M.M., H.W., and A.P. It determined that the mother had failed to comply with the reunification plans and that "[the mother's] present living conditions with [her boyfriend] do not constitute a stable home," noting that the mother had not been consistently employed and that she lived with and financially relied upon a man who was not her husband and who was an illegal alien. In addition, the court noted the psychologist's report.
On appeal, the mother concedes that because she did not appeal the court's ruling that her children were deprived, she is bound by that ruling. And she does not contest that the deprivation was the result of her conduct. However, the mother contends that it was not established by clear and convincing evidence that the causes of deprivation were likely to continue and that the continued deprivation would cause or was likely to cause serious physical, mental, emotional, or moral harm to the children.
The cause of the deprivation was attributed to domestic violence and conditions in the home unfit for the children's health and safety. Nothing in the record provides clear and convincing evidence that those causes of deprivation are likely to continue. DFACS presented testimony that although the mother's first home was cluttered, it was adequate. Thereafter, the mother moved from that two-bedroom home to three-bedroom homes. The mother testified at the final hearing that her home would accommodate the children. DFACS never visited that home despite being informed of the mother's relocation and thus presented no evidence to the contrary. The mother completed a parenting course, and there is no evidence that her lifestyle included domestic violence or drugs.
The record demonstrates that the mother remained cooperative with DFACS and the court. She kept DFACS informed of her progress. She submitted to a psychological evaluation and participated in mediation. Thereafter, she took on additional goals, undergoing counseling regarding not only her diagnosis, but that of her children. She committed to remain in a "stable living arrangement" and find employment, both within a time frame of six months. And during that time period, she, her fourth child, and her boyfriend remained in the same home. Although there were periods of unemployment, the mother had earned money by cleaning *830 homes, selling food from her home, and working a series of jobs. She was terminated from her last two jobs because of her commitment to maintain scheduled visits with her children. A DFACS caseworker confirmed that the mother had consistently visited her children and that the visits went well. And, the guardian ad litem opposed terminating the mother's parental rights.
This court is sympathetic to an argument that all children should be exposed to the best possible circumstances.[4] Yet "[a] mother's failure fully to live up to societal norms for productivity, morality, cleanliness and responsibility does not summarily rob her of the right to raise her own offspring, nor does it end the child's right to be raised by its own mother."[5] This court has held that "the fact that a mother is unemployed, without prospects for future employment, and without any stable living arrangements is not sufficient to terminate parental rights."[6]
[T]here is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship. It must be scrutinized deliberately and exercised most cautiously. Accordingly, compelling facts are required to terminate parental rights.[7]
In light of the evidence presented, the juvenile court erred in determining that there was clear and convincing evidence that the cause of the children's deprivation with respect to the mother was likely to continue.[8]
2. Our decision in Division 1 renders the mother's remaining claims of error moot.
Case No. A03A1175
3. At the preliminary detention hearing on June 2, 1997, appellant stated that he was A.P.'s biological father and asked the court how he could obtain custody of his child. The court advised him that until and unless he legitimated A.P., he could not be a party to the case. Thus, that same year, appellant began the process of legitimating his daughter. And in April 1999, an order established him as A.P.'s legal father. In June 1999, a reunification plan set three goals for the father: (1) maintain a lifestyle free of domestic violence, (2) maintain stable housing, and (3) remain cooperative with DFACS. At that time, the father requested visitation with A.P. separate from A.P.'s visitation with her mother, and his visitation was scheduled for every other Friday. (Before that time, the father had visited A.P., but could do so only with the mother because he was not then A.P.'s legal father.)
At the February 2000 termination hearing, a DFACS caseworker reported on the father's progress with the reunification plan. The first goalmaintain a lifestyle free of domestic violencerequired him to "enroll in anger management classes" and follow recommendations of counselors. DFACS presented no evidence of domestic violence. The father had completed a parenting course, but had not taken an anger management course.
The second goalmaintain stable housingrequired the father to maintain a clean and safe home, one free of domestic violence. DFACS had evaluated the father's home on July 12, 1999, and determined that it was not suitable. A DFACS caseworker testified the home was rejected for lack of "stability," explaining, "[t]he problem with the housing is... [the father] does maintenance in the trailer park where he lives, and he goes into a trailer, he lives there, he fixes it up, and then he moves to the next one, fixes it up and does the maintenance around the trailer park." The caseworker further testified that tools in the father's home rendered the home unsafe for A.P. DFACS's home evaluation report, however, described the home as a *831 "decent and safe manufactured home," "free of debris," and "free from clutter."
The third goalremain cooperative with DFACSrequired the father to schedule visitation with A.P. and keep DFACS informed of his whereabouts. The caseworker reported that the father had missed only two scheduled visitsone was not his fault and the other was cancelled by the father beforehand and later rescheduled.
The father is from Mexico and testified through an interpreter. He stated that there was always a communication gap between him and the caseworker. He testified that because he had not received instructions to attend an anger management course, he had taken it upon himself to enroll in and complete a parenting course, which he later learned would not satisfy the anger management course requirement. He also testified that the caseworker had misunderstood his living arrangements. While he was the repairman at the trailer park where he lived, he had always lived in his own trailer there. He and his girlfriend had been living together for two years. The home had two bedrooms, one of which already contained a bed and toys for A.P. He had made arrangements with a family member who lived in the trailer park to care for A.P. when he worked. That arrangement, the father explained, would allow him to check on A.P. at any time. He stated that he wanted his daughter to live with him and that he had either done what had been asked of him or, at least, had taken steps toward accomplishing the requirements.
The father admitted that he had not legally entered the United States. He had been working full time as the maintenance man at the trailer park for two and a half years, earning about $300 each week. He stated that he had not paid any child support because no one had ever told him that he needed to do so.
The juvenile court remarked that it had a "problem with [the father's] INS situation" and his live-in girlfriend, stating that "resolution[s]" on those issues would be required before it would consider placing A.P. with her father. The court continued the hearing regarding A.P. and her siblings.
When the hearing resumed in October 2000, a DFACS caseworker reported that since her involvement with the case, which began March 1999, the father had missed a total of three visits with A.P. Also, she reported, he had attended most sessions of an anger management course, but had not returned after being told that he could not return without an interpreter.
The father testified that he had attended anger management classes for about six months and had paid all but $20 of the $240 course fee. He had started a new job, at which he was earning $9 an hour. He also continued to perform maintenance at the trailer park. He reported that he still lived in the same trailer, where A.P. would have her own room. A.P.'s mother confirmed that A.P.'s father had been living in the same trailer for about three years. The father had still not paid any child support, stating that no one had asked him to do so. And his immigration status had not changed.
In November 2000, the court referred the case to mediation, and a modified reunification plan was developed. The father agreed to pay child support, to allow a new home evaluation, and to "show that he is taking positive steps toward correcting legal status while in the United States." At the September 2001 termination hearing, a DFACS caseworker reported that the father had begun paying child support. DFACS did not visit the father's home because he had not complied with all of the terms of the mediation. He had not, for instance, "legalized himself as a citizen."
The father and his attorney reported that they had been working on the father's immigration status. The father testified that he wanted his daughter to live with him, that his girlfriend no longer lived with him, that there was room for A.P. at his home, and that he had made day care arrangements for her. He kept each of his visitation appointments with A.P., and a DFACS caseworker reported that the visits had gone "very well. [A.P.] is very excited to see him." The father testified, "I feel very happy when I see her and there's nothing more than that."
*832 The guardian ad litem spoke against termination, stating that A.P.'s father had tried to do all that he could and that with the threats of parental rights termination and deportation, the father was "between a rock and a hard place." The court terminated the father's parental rights to A.P., determining that the father had done nothing to legalize his residency in the United States, that even if he later attempted to do so, he would face deportation, that the child could then be returned to protective custody or taken with her father to "an unknown future in Mexico," and that it was unwilling to subject A.P. to those possibilities.
The father contends that the evidence was insufficient to authorize termination, asserting, among other grounds, that there was not clear and convincing evidence that the causes of deprivation were likely to continue. The cause of A.P.'s deprivation was attributed to domestic violence and conditions in her home unfit for her health and safety.
DFACS argues that the father's rights should be terminated. It asserts that the father failed to comply fully with the reunification plans, pointing out that he never completed the anger management course and never became a legal resident. But not only did the father attend a majority of the sessions of an anger management course, it appears that he has maintained a lifestyle free of domestic violence. Case plans are significant factors, but delayed compliance with a minority of a plan's goals cannot serve as the sole basis for terminating parental rights.[9]
Furthermore, the record in this case does not demonstrate that the father "failed significantly" to (a) develop and maintain a parental bond with A.P. in a meaningful, supportive manner; (b) provide for her care and support as required by law or judicial decree; or (c) comply with the reunification plans.[10] DFACS presented contradicting evidence regarding the father's housekeeping as of July 1999. And its claim that the father maintained no permanent residence was weakened by contradictory testimony by the father and A.P.'s mother. In October 2000, the father testified that his home was adequate for A.P. DFACS, having made no visits to the father's home after July 1999, presented no evidence to the contrary. The father remained cooperative with the court and DFACS, participating in mediation and thereafter taking on additional goals. He began paying child support and working with an attorney to obtain legal residency. The father maintained full-time employment throughout the case and had made arrangements for A.P.'s day care. From A.P.'s first day in DFACS's care, her father had been seeking custody of her. He consistently visited her, even before DFACS created a schedule for him to do so. And there was evidence that the two enjoyed a positive relationship. The guardian ad litem opposed terminating the father's parental rights.
Essentially, the termination of the father's parental rights was based on the possibility that the father could someday be deported and, with her mother's parental rights also severed, A.P. might be returned to DFACS's custody or sent to Mexico. When we wield the awesome power entrusted to us in these cases, our decisions must be based on clear and convincing evidence of parental misconduct or inability and that termination is in the best interest of the child, and not speculation about "the vagaries or vicissitudes that beset every family on its journey through the thickets of life."[11] A court may not sever a parent-child relationship solely because it has determined that the child might enjoy certain advantages elsewhere.[12] Moreover, we have reversed the termination of the parental rights of A.P.'s mother. Permanent severance of a natural parent-child relationship must be exercised cautiously and scrutinized deliberately.[13] *833 It is a "remedy of last resort" that cannot be sustained where there is no clear and convincing evidence that the cause of the deprivation is likely to continue.[14] Because that evidence was not clear and convincing, termination of the father's parental rights to A.P. was error.[15]
4. Our decision in Division 3 renders the father's remaining claims of error moot.
Judgments reversed in Case Nos. A03A1174 and A03A1175.
BLACKBURN, P.J., and ELLINGTON, J., concur.
NOTES
[1] Formerly OCGA § 15-11-81.
[2] (Footnote omitted.) In the Interest of T. B., 249 Ga.App. 283, 285-286(1), 548 S.E.2d 45 (2001).
[3] Id. at 286, 548 S.E.2d 45.
[4] See Shover v. Dept. of Human Resources, 155 Ga.App. 38, 40(1), 270 S.E.2d 462 (1980).
[5] (Citations and punctuation omitted.) Id.
[6] In the Interest of K.J., 226 Ga.App. 303, 305(1), 486 S.E.2d 899 (1997); see generally Chancey v. Dept. of Human Resources, 156 Ga.App. 338, 340(1), 274 S.E.2d 728 (1980).
[7] (Citation and punctuation omitted.) In the Interest of K. J., supra at 306, 486 S.E.2d 899.
[8] See id. at 303-306, 486 S.E.2d 899; Shover, supra.
[9] In the Interest of T.B., 242 Ga.App. 564, 569(6), 529 S.E.2d 620 (2000).
[10] See generally OCGA § 15-11-94(b)(4)(C).
[11] See Shover, supra at 40, 270 S.E.2d 462.
[12] See id.; compare In the Interest of C.T., 247 Ga.App. 522, 524(1), 544 S.E.2d 203 (2001); In the Interest of R. H., 240 Ga.App. 551, 553, 524 S.E.2d 257 (1999).
[13] In the Interest of V.S., 249 Ga.App. 502, 505(1)(b), 548 S.E.2d 490 (2001).
[14] In the Interest of K.M., 240 Ga.App. 677, 680, 523 S.E.2d 640 (1999).
[15] See id.; In the Interest of B.F., 253 Ga.App. 887, 560 S.E.2d 738 (2002).