**FOURTH DIVISION**
**ANDREWS, P. J.,**
**DOYLE, P. J., and BOGGS, J.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**November 13, 2014**

# In the Court of Appeals of Georgia

A12A0981. ALIZOTA v. STANFIELD et al.                    DO-045

DOYLE, Presiding Judge.

This appeal arises from the trial court's entry of judgment terminating Emmanuel Alizota's parental rights and grant of a petition of adoption of S. K. filed by Ryan and Melissa Stanfield.[1] When this Court originally addressed this appeal, we vacated the superior court order terminating Alizota's parental rights and granting the Stanfields' petition for adoption because the superior court lacked jurisdiction to enter an adoption order.[2] The Stanfields petitioned the Supreme Court for certorari, which granted the petition and reversed our opinion, holding that because the

---

[1] The trial court also terminated the rights of M. K., S. K.'s biological mother, who is also the sister of Melissa Stanfield, but M. K. is not a party to this appeal.

[2] See *Alizota v. Stanfield*, 319 Ga. App. 256 (734 SE2d 497) (2012).

termination of Alizota's parental rights had not been raised previously in the juvenile court during deprivation proceedings, the juvenile court did not have priority jurisdiction over the termination.[3] The Supreme court remanded the case for further proceedings, and we now reverse the trial court's order, for the reasons that follow.

On appeal from an order terminating parental rights based on an adoption petition, we construe the evidence favorably to the trial court's ruling and determine whether any rational trier of fact could have found by clear and convincing evidence that the biological parent's rights to custody have been lost. We do not weigh the evidence or assess witness credibility, but defer to the trial court's factual findings and affirm unless this standard is not met.[4]

So viewed, the record reflects that on December 9, 2009, S. K.'s mother was arrested for driving under the influence while S. K. was in her vehicle.[5] Based on the incident, the Department of Family and Children Services ("the Department") took

---

[3] See *Stanfield v. Alizota*, 294 Ga. 813, 817 (756 SE2d 526) (2014).

[4] (Punctuation omitted.) *Dell v. Dell*, 324 Ga. App. 297 (748 SE2d 703) (2013), quoting *Weber v. Livingston*, 309 Ga. App. 665 (710 SE2d 864) (2011); *In re Marks*, 300 Ga. App. 239, 240 (684 SE2d 364) (2009).

[5] Melissa testified that on the night of the DUI, she woke the mother (who was living with the Stanfields at the time) to confront her about alcohol use, and the two argued, at which time the mother took her older child, J. S., and S. K. to her car and left the Stanfields' home. The Stanfields then called 911 to report that she was drinking and driving with the children in the car.

S. K., who was approximately six months old at the time, into shelter care and placed her in the care of the Stanfields pending a deprivation hearing.[6] On January 22, 2010, the Juvenile Court of Fayette County entered an order adjudicating S. K. deprived as to the mother on the grounds of neglect, lack of proper parental care and supervision, and drug use.[7]

Upon becoming involved in S. K.'s case, the Department contacted Alizota as the putative father (he was not listed on the birth certificate), who moved to legitimate the child, and the juvenile court granted his motion in March 2010. The Stanfields, however, opposed the legitimation. According to Melissa, the mother lived with the Stanfields during S. K.'s infancy, Alizota was not involved with S. K. between the

---

[6] Melissa is the mother's twin sister. She and Ryan have been married since 2004, and they do not have biological children.

[7] The mother's case is not before this Court, but the record shows that she has had long-term addiction related issues, and this was the second time she had been arrested for DUI while her children were in the vehicle. The first incident occurred in 2004, and her older child, J. S., who is not Alizota's child, was taken temporarily from her care. J. S. was put into his father's care after the mother was arrested in the 2009 incident. Melissa testified that she received a call from Alizota at about 2:00 a.m. on December 9, 2009, after the mother was arrested, asking where the mother was, if she was coming to his home, and how the children were doing. Melissa testified that she did not prohibit him from coming to get S. K. (she did state that "he might have asked if [S.K.] is okay. I said I have her. He wasn't the father. He wasn't the legal father"; however, Alizota testified that she would not allow him to get the child.

3

time she was approximately one-month old and shortly after the mother's arrest in December 2009, at which point Alizota visited with S. K. through the Department.[8] The Department developed a reunification case plan for Alizota that, among other things, required him to obtain a steady source of income and stable housing, screen negative for drug use, and pay child support.

Alizota and the mother eventually consented to a non-reunification plan, and long-term temporary custody of S. K. was given to the Stanfields, pursuant to OCGA § 15-11-58 (i). The parties met in mid-April and consented to the entry of non-reunification with relinquishment of custody by the mother and Alizota to the Stanfields, and the juvenile court entered a consent order dated June 14, 2010, nunc pro tunc April 15, 2010, and an amended consent order dated August 18, 2010, nunc pro tunc June 14, 2010, finding that Alizota had agreed to relinquish custody of S. K. and granting custody to the Stanfields until S. K. reached 18 years old.

The order also found that Alizota wished to remain active in S. K.'s life, and the court ordered supervised visits for Alizota, finding that he could later move for unsupervised visits with the child. As part of the order, Melissa stipulated that she

---

[8] Melissa testified that from the time S. K. was born, the mother was her primary caregiver until she was taken into shelter care by the Department in December 2009.

4

would supervise visits with the parents and she would not oppose unsupervised visits. Finally, in line with the statutory provisions of OCGA § 15-11-58 (i) (2) (A), the juvenile court ordered the Department to review S. K.'s placement every 36 months.

Immediately after custody was transferred to the Stanfields, Melissa halted S. K.'s visitation with Alizota until he provided her with a clean drug test despite the fact that Alizota had been visiting with S. K. until that time under the Department's supervision. In early July 2010, the parties went to court to resolve the visitation issue, and the juvenile court ordered Alizota to provide drug tests to the Department; by August 2010, the clean drug screens had been completed and by September 2010, the juvenile court had ordered Melissa to allow visitation in two, hour-long visits.

From August 2010 to January 2011, Alizota, who previously had completed parenting classes, visited with S. K., first on a supervised basis and later on an unsupervised basis, and he also remitted child support to the Stanfields, had begun to bond well with S. K., and had no positive drug screens.

By November 2010, Department case managers were in favor of having Alizota visit more frequently with S. K. so that they could have adequate time to bond; however, Melissa allowed for visits only as directly ordered by the juvenile court. Just before Thanksgiving 2010, Melissa became upset when she was not allowed to

accompany Alizota during visitation. In December 2010, the Stanfields hired Dana Spears, a child psychologist, to observe S. K. and Alizota.

Despite entering into the consent order, on December 3, 2010, the Stanfields filed a petition for adoption of S. K. in the Superior Court of Fayette County, at which time S. K. was two days shy of being 18 months old. The petition alleged that Alizota (1) failed to develop and maintain a paternal bond with the child in a meaningful, supportive manner; (2) without justifiable cause failed to become a United States citizen and thus "face[d] criminal charges and deportation every minute of every day"; (3) without justifiable cause failed to provide for the care and support of the child as required by law for a period in excess of 12 months prior to date of filing; (4) never lived with the child; and (5) failed to exercise proper parental care or control of the minor child due to misconduct or inability as defined in OCGA § 15-11-94 (b) (4).

Alizota answered the petition, challenging the Stanfields' contentions that S. K. was in danger of ongoing deprivation and that it was in S. K.'s best interest to terminate his parental rights, and he asked the superior court to deny the adoption petition and counterclaimed for permanent custody of S. K.

The superior court held hearings on January 27, 2011, and March 9, 2011. The Stanfields appeared on their own behalf along with Dana Spears, a child psychologist hired by them in December 2010. Alizota called several witnesses from the Department, including DeShay Rice-Clansy, who was S. K.'s case manager in January 2010.

Rice-Clansy testified that the Department became involved in S. K.'s family through a family preservation plan that began in Forsyth County and transferred to Fayette County, when the mother moved in with the Stanfields; the mother had tested positive for cocaine and methamphetamine. At that time, Alizota was not a part of the case plan because he had no custodial rights to S. K. She testified that the Department's first significant interaction with Alizota began when he was at the team meeting on January 12, 2010, to develop a reunification plan after S. K.'s removal from the mother.

With regard to Alizota's participation in parenting classes, Rice-Clansy testified that "I thought [his] progress . . . was outstanding because he was willing to listen to any advice [the instructor] was giving on how to deal with [S. K.] He was open to any instructions that she was willing to give for his involvement with [S.

K.]"[9] She also stated that "[the Department] couldn't have asked for . . . a parent to be more willing to go ahead and complete their case plan."

According to Rice-Clansy, Alizota had completed the parenting class requirement in his reunification plan at the time the case was closed. Rice-Clansy testified that Alizota was also compliant with his housing and income requirements, his individual therapy sessions, his drug addiction classes, and his child support requirements. Rice-Clansy testified that the only instance of a positive drug screen she received from Alizota was when he used cocaine with the mother in April 2010. She also testified that he reported as instructed to child support enforcement, but Melissa was obstructing his ability to set up a case for S. K. because she would not release the child's social security number to Alizota. Rice-Clansy spoke to Melissa about the issue, and she found Melissa was impeding Alizota's attempts to set up the child support plan and recommended that Alizota pay Melissa with money orders so that there would be evidence of payment; she said that the stone-walling continued until the summer of 2010 when the child support case was finally opened.

---

[9] The parenting class instructor had moved to Kentucky, and although she was subpoenaed, she was not available at the hearing.

Rice-Clansy stated that Melissa was against including Alizota in the reunification plan from the family meeting on January 12, and the Department contemplated removing S. K. from the Stanfields as a result of her vehement opposition. In addition to her resistence to accepting child support, from January 2010 to April 2010, Melissa also failed to notify Alizota of medical appointments and canceled visitation with him on numerous occasions. With regard to the April drug screen, Rice-Clansy testified that it was never a requirement of the Department that Alizota have negative drug screens in order to *visit* with S. K. Rice-Clansy stated that at the time the parents decided to sign the long-term custody agreement with the Stanfields, Alizota was completing all his case plan goals, and it was her opinion that custody should remain with the Department because Alizota "was actively working [his] case plan" and "[had] a bond with the child" or believed if S. K. were still in Department custody at the time of the trial court's hearing, that case worker would have recommended that Alizota have custody of S. K. Rice-Clansy testified that despite the Stanfields' assurances that they would facilitate visitation with S. K., they began to prohibit him from visiting after custody was transferred.

Karen Langston, a Department case worker who observed between four and five visits between Alizota and S. K. after visitation resumed in August, stated that

9

she observed bonding between the two. She testified that Alizota acted appropriately, and she had no concerns that he was missing the fundamentals of parenting.

Lisa Nebel, a supervisor at the Department, testified that she observed some of the fall 2010 visits and determined that they should be unsupervised visits without Melissa present because Nebel "felt like the child was comfortable with [Alizota,] and there appeared to be a bond. [Alizota] was very appropriate with the child[,] and they were his visits." She testified that Alizota was very serious about his plan, and she felt it would have been better had the parents not transferred custody to the Stanfields. Additionally, Kimberly Bunch, a CASA volunteer, observed some of Alizota's earlier visits with S. K. and found him to be engaging and that the two were comfortable with each other.

On May 20, 2011, the trial court found that Alizota

(1) failed to develop and maintain a parental bond with the child in a meaningful supportive manner; (2) failed to live with the child; (3) failed to exercise proper parental care or control of the minor due to misconduct or inability as defined by OCGA § 15-11-94 (b) (4); (4) no "verifiable, stable income, [and could not] provide for the necessities such as food, clothing and shelter"; (5) failed to acquire a green card, work visa, or citizenship; (6) failed to secure a driver's license and drove without a license; (7) [failed] to leave the country in order to apply for U. S. citizenship, and S. K. would be without proper parental

10

care if he leaves the country; (8) had a history of abusing cocaine; (9) provided the mother with cocaine during her pregnancy with S. K.; (10) refused drug screens from April 2010 to August 2010; (11) had "not maintained appropriate, stable housing having moved twice, last into the home of someone he had known for six months and upon whom he is dependent for housing"; (12) had missed visitation without offering an excuse or reason for doing so; (13) not established or maintained a bond with S. K.; (14) was not involved in S. K.'s life until summoned to court by the Department; and (15) had not paid child support until threatened with incarceration for not doing so.

The trial court concluded that Alizota

failed to support his child for a period of 12 months, failed to establish and maintain a bond with his child, failed to establish and maintain stable housing suitable for him and [S. K.], failed to establish and maintain stable income sufficient to support himself and his children, . . . failed to become and remain drug free, . . . failed to secure a Georgia [d]river's license, and . . . not demonstrated that any of the alleged recent improvements render[ed] him capable of parenting.

The trial court then ordered his rights terminated and granted the petition for adoption of S. K. by the Stanfields.

11

Alizota appeals, arguing that the trial court erred by terminating his rights and granting the petition for adoption because there was insufficient evidence to support the trial court's determination. We agree.

Generally,

> a child who has any living parent or guardian may be adopted by a relative who is related by blood or marriage to the child as a grandparent, great-grandparent, aunt, uncle, great aunt, great uncle, or sibling *only* if each such living parent and each such guardian has voluntarily and in writing surrendered to that relative and any spouse of such relative all of his or her rights to the child for the purpose of enabling that relative and any such spouse to adopt the child.[10]

Pursuant to former OCGA §19-8-10 (a), however, such surrender of rights is not required as a prerequisite to filing a petition for adoption if

> the court determines by clear and convincing evidence: (1) [that the c]hild has been abandoned by that parent; . . . [or] (4) [that the p]arent has failed to exercise proper parental care or control due to misconduct or inability, as set out in paragraph (3), (4), or (5) of subsection (a) of Code Section 15-11-94 (b) (2) - (5). . . .

Alternatively, OCGA § 19-8-10 (b) provides

---

[10] (Emphasis supplied.) OCGA § 19-8-7 (a) (2011).

12

that the court may still grant . . . a petition to adopt the child if it finds, inter alia, that there is clear and convincing evidence that the parent, for a period of one year or longer immediately prior to the filing of the petition for adoption, *without justifiable cause*, has *significantly* failed: (1) To communicate or to make a bona fide attempt to communicate with that child in a meaningful, supportive, parental manner; or (2) To provide for the care and support of that child as required by law or judicial decree.[11]

The inquiry to determine whether there is "parental misconduct or inability" is the same made by a juvenile court in termination cases — "a finding that the child is deprived, the lack of proper parental care or control by the parent is the cause of the child being deprived, the cause of deprivation is likely to continue or will not likely be remedied, and the continued deprivation will cause or is likely to cause serious harm to the child."[12] Under former OCGA § 15-11-94 (b) (4), the court may terminate if

(4)(A) [t]he court determines parental misconduct or inability by finding that: (i) [t]he child is a deprived child, as such term is defined in Code Section 15-11-2; (ii) [t]he lack of proper parental care or control by the

---

[11] (Emphasis in original). See *In re Petition of Marks*, 300 Ga. App. at 239, 242 (1) (684 SE2d 364) (2009).

[12] *In the Interest of A. W.*, 240 Ga. App. 259 (523 SE2d 88) (1999).

13

parent in question is the cause of the child's status as deprived; (iii) [s]uch cause of deprivation is likely to continue or will not likely be remedied; and (iv) [t]he continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child. (B) In determining whether the child is without proper parental care and control, the court shall consider, without being limited to, the following: (i) [a] medically verifiable deficiency of the parent's physical, mental, or emotional health of such duration or nature as to render the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child; (ii) [e]xcessive use of or history of chronic unrehabilitated abuse of intoxicating liquors or narcotic or dangerous drugs or controlled substances with the effect of rendering the parent incapable of providing adequately for the physical, mental, emotional, or moral condition and needs of the child; (iii) [c]onviction of the parent of a felony and imprisonment therefor which has a demonstrable negative effect on the quality of the parent-child relationship; (iv) [e]gregious conduct or evidence of past egregious conduct of the parent toward the child or toward another child of a physically, emotionally, or sexually cruel or abusive nature; (v) [p]hysical, mental, or emotional neglect of the child or evidence of past physical, mental, or emotional neglect of the child or of another child by the parent; and (vi) [i]njury or death of a sibling under circumstances which constitute substantial evidence that such injury or death resulted from parental neglect or abuse; (C) [i]n addition to the considerations in subparagraph (B) of this paragraph, *where the child is not in the custody of the parent who is the subject of the proceedings, in determining whether the child is without proper parental care and control, the court*

*shall consider, without being limited to, whether the parent without justifiable cause has failed significantly for a period of one year or longer prior to the filing of the petition for termination of parental rights*: (i) [t]o develop and maintain a parental bond with the child in a meaningful, supportive manner; (ii) [t]o provide for the care and support of the child as required by law or judicial decree; and (iii) [t]o comply with a court ordered plan designed to reunite the child with the parent or parents . . . .[13]

"[T]he court should remain mindful that the time limitation in OCGA § 15-11-94 (b) (4) (C) is designed to give the parent whose rights are subject to termination sufficient time and opportunity to demonstrate his or her ability to comply with the terms of the court's order."[14]

If the petitioner meets that burden of proof and the court finds that one of the above situations exists, then the court must also determine whether the proposed adoption is in the best interest of the child. With regard to the best interest test in adoption cases, the trial court has very broad discretion with which this Court will not interfere except in cases of plain abuse. However, *a court is not allowed to terminate a parent's natural right because it has determined that the child might have better financial, educational[,] or even moral advantages elsewhere. Only*

---

[13] (Emphasis supplied.) OCGA § 15-11-94 (b) (2011).

[14] (Footnote and punctuation omitted.) *In the Interest of B. N. A.*, 248 Ga. App. 406, 410 (1) (546 SE2d 819) (2001).

15

*under compelling circumstances found to exist by clear and convincing proof may a court sever the parent-child custodial relationship.* The requirements of Georgia's adoption statutes are mandatory and must be strictly construed in favor of the natural parents, because the application thereof results in the complete and permanent severance of the parental relationship.[15]

In this instance, the trial court's decision to terminate Alizota's parental rights is not supported by clear and convincing evidence.[16] While we are cognizant of the deferential standard of review,[17] there is no clear and convincing evidence of a deprivation or any factors in OCGA § 19-8-10 (a) or (b). Courts must remember that "[t]here is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship. It must be scrutinized deliberately and exercised most cautiously."[18] With this precept in mind, we conclude

---

[15] (Emphasis supplied; punctuation omitted.) *In re Petition of Marks*, 300 Ga. App. at 242-243.

[16] See *In re Petition of Marks*, 300 Ga. App. at 246 (3).

[17] See id. at 240.

[18] (Punctuation omitted.) *Jones v. Dept. of Human Resources*, 168 Ga. App. 915, 916 (1) (310 SE2d 753) (1983), quoting *McCormick v. Dept. of Human Resources*, 161 Ga. App. 163, 164 (288 SE2d 120) (1982).

16

that the trial court was not authorized to grant the adoption pursuant to OCGA §§ 19-8-10 (a) (4) and 15-11-94 (b).[19]

First, the trial court made numerous findings in support of its determination to terminate Alizota's parental rights that establish that the decision rests upon inappropriate factors, namely, Alizota's non-citizen status, his lack of a driver's license, and the "verifiability" of his income.[20] In the year prior to the adoption petition, Alizota paid child support to the Stanfields for at least six months and produced documentation from numerous sources that he attempted to pay them even

---

[19] See *In re Petition of Marks*, 300 Ga. App. at 246 (3), citing *McCollum v. Jones*, 274 Ga. App. 815, 823 (3) (a) (3) (619 SE2d 313) (2005) (physical precedent only); *In the Interest of M. M.*, 263 Ga. App. 353, 359 (1) & 362-363 (3) (587 SE2d 825) (2003).

[20] See, e.g., *In the Interest of M. T. F.*, 318 Ga. App. 135, 147-148 (1) (c) (733 SE2d 432) (2012) (the trial court's findings related to a parent's ability to provide for a child could not be upheld because the court failed to explain what it considered to be "verifiable proof of income" and parent had provided evidence of supporting child's material needs); *In the Interest of M. M.*, 263 Ga. App. at 359 (1) & 362-363 (3) ("the fact that a [parent] is unemployed, without prospects for future employment, and without any stable living arrangements is not sufficient to terminate parental rights"; termination based on the speculation that a child might be deported to a foreign country if non-citizen parent is also deported is not sufficient to support termination) (punctuation omitted); *In the Interest of E. N. C.*, 384 SW3d 796, 807 n.13 (Tex. 2012) (persuasive authority) (collecting cases establishing the majority of state courts have determined that "illegal status and deportation are not in themselves grounds for the termination of parental rights").

17

earlier, but was hampered by Melissa's refusal to cooperate. Additionally, he provided evidence that he wired money to the mother while S. K. was in her custody and during the time period that the Department had custody of the child. Although he could not prove that the mother used the money for supplies, it is clear that the attempt was made. And while S. K.'s opportunities may be enlarged while living with the Stanfields or in the United States, it does not automatically follow that a deprivation occurs simply because a custodial parent may be forced to return to his country of origin.

We also must recall that lack of a driver's license or access to an automobile is not equivalent to a deprivation. There is no evidence that Alizota has physically endangered S. K. or that he has ever been arrested or convicted of a crime. The better practice is for him to abstain from driving without a Georgia license, but again, it does not follow that deprivation occurs because a parent must utilize other modes of travel.

Moreover, of the remaining findings in support of its determination, a number are contrary to the evidence presented. In the time period between when S. K. was

removed from the mother and when the Stanfield's petition was filed,[21] Alizota completed parenting classes, completed drug and alcohol treatment, completed individual therapy, attended regular visitation with S. K. (despite the fact that Melissa, who did not work outside the home, had only two days per week available for Alizota's visitation), and consistently paid and was up to date with child support.[22] Alizota is no longer in a relationship with the mother, whose parental rights were terminated by the trial court, and who was undeniably the primary source of the deprivation.[23] He is now married to a U.S. citizen, and although their relationship has

---

[21] We note again that Alizota did not legitimate S. K. until March 2010, and although he bailed the mother out of jail after her December 2009 DUI arrest and asked if he needed to get S. K. from the Stanfields, he was told by Melissa that he could not come get her because "he wasn't the legal father."

[22] See *In the Interest of V. S.*, 249 Ga. App. 502, 507 (1) (b) (548 SE2d 490) (2001) (trial court erred by terminating father's rights under OCGA § 15-11-94 (b) (4) (C) because only seven months had elapsed between the filing of the termination petition and the hearing, which was an insufficient amount of time for completion of the father's case plan goals based on the progress he had made at the time of the hearing), citing *In the Interest of R. H.*, 240 Ga. App. 551, 553 (2) (524 SE2d 257) (1999). See also *In the Interest of K. M.*, 240 Ga. App. 677, 680 (523 SE2d 640) (1999) ("evidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in her natural child; clear and convincing evidence of present unfitness is required") (punctuation omitted), quoting *In the Interest of R. A.*, 226 Ga. App. 18, 20 (486 SE2d 363) (1997).

[23] See *In the Interest of M. A.*, 280 Ga. App. 854, 857 (1) (635 SE2d 223) (2006).

not been a long one, the two co-parent her child, maintain a home together, and have been the subject of no allegations of mistreatment or neglect.

With regard to the trial court's finding that Alizota "failed to become and remain drug free," it is undisputed that after a single instance of a positive toxicology screen during the pendency of his case plan, he has, for the eight months immediately preceding the adoption petition,[24] provided evidence that he was drug free and completed drug and alcohol awareness classes. There is no evidence that his wife suffers from substance abuse issues as was the case with the mother, and therefore, it is even less likely that this "cause of the deprivation is likely to continue or will not likely be remedied."[25]

Finally, the only remaining ground upon which the trial court's determination that termination is appropriate is its finding that Alizota had not bonded with S. K. The only evidence in support of this finding was Spear's testimony, who was hired by the Stanfields on December 1, 2010, in preparation of filing the petition and who observed two, hour-long visits during the time period immediately preceding the

---

[24] We reiterate that the adoption petition was filed within nine months of the filing of the permanent custody agreement.

[25] See OCGA § 15-11-54 (b) (4) (A) (iii) (2011).

20

petition.[26] In contrast, every Department worker testified that Alizota was bonding to the child, whom we emphasize was between the ages of 6 months old and 18 months old during the immediate preceding year. And given how little time had elapsed prior to the petition, it was error for the trial court to grant the termination of Alizota's rights on this ground.[27]

3. We do not address Alizota's petition for change of custody, as it is for the trial court to address in the first instance.

*Judgment reversed. Andrews, P. J., and Boggs, J., concur.*

---

[26] Regarding Spears's testimony, we note that she detailed at length how little S. K. liked the room in which visitation had to occur, and she presented an extended narrative about an 80-year-old client who she hypothesized had anxiety based on an early separation from care-givers. She also testified that children should not be separated from their primary care-givers during the first two years of their life in order to be able to form healthy attachments. Although this premise may be based on reliable, valid scientific research, it is not in keeping with the principals of this State's law surrounding termination of parental rights and reunification with biological parents as the first goal after a removal. In any event, at the time of the petition, Alizota had agreed to allow the Stanfields to have permanent custody of S. K., and he did not appear poised to move immediately for a change of custody until the Stanfields began barring him from visiting with the child and moving for adoption.

[27] See *In the Interest of V. S.*, 249 Ga. App. at 506 (1) (b).