606 S.E.2d 59 (2004)
270 Ga. App. 26
In the Interest of J.T.W., a child.
No. A04A0961.
Court of Appeals of Georgia.
October 8, 2004.
*60 Benson, Phillips & Hoffman, Jason K. Hoffman, Tifton, for appellant.
Thurbert E. Baker, Attorney General, Shalen S. Nelson, William C. Joy, Senior Assistant Attorneys General, for appellee.
ADAMS, Judge.
The mother of J.T.W. appeals the termination of her parental rights. She contends that the appellee failed to present sufficient evidence to support the juvenile court's decision.
The Department of Family and Children Services became involved with Chayla W.'s fourth child, J.T.W., in February 2001. The Department obtained emergency custody on March 26 and filed a deprivation petition one *61 month later. On July 26, following a hearing, the juvenile court found the child to be deprived, ordered the child placed in DFACS's care, and approved a nonreunification case plan. Chayla did not appeal that order.
On August 30, 2001, DFACS filed a petition to terminate Chayla's parental rights to J.T.W., as well as those of the legal father and the biological father, and the court held a hearing on November 26. The court entered a written order on March 28, 2002, in which it granted the petition as to the legal and biological fathers but denied the petition as to Chayla. The court later extended DFACS's temporary legal custody of the child. On April 22, 2003, DFACS again petitioned to terminate Chayla's parental rights, and the court conducted a hearing on July 11. On October 23, 2003, the court issued an order terminating Chayla's rights, and she now appeals.
1. "On appeal, we view the evidence in the light most favorable to the juvenile court's ruling and determine whether a rational trier of fact could have found by clear and convincing evidence that the parent's rights should have been terminated." (Footnote omitted.) In the Interest of T.B., 249 Ga.App. 283, 286(1), 548 S.E.2d 45 (2001).

Background
Construed in favor the juvenile court ruling, the evidence shows that on September 26, 1994, when she was 19 or 20 years old, Chayla married Tommy W., and one year later, their first child, A.W., was born. The marriage was marked by multiple incidents of abuse, including one where Tommy struck the child. On January 23, 1997, at a time when the couple was separated, Colquitt County DFACS removed the child based on a history of domestic violence in the family, the parents' failure to address the child's medical needs, and a pattern of moving the child from one caregiver to another. Chayla never completed the associated Colquitt County case plan, and her rights to A.W. were terminated. The child was placed with Tommy's parents and remains there today. Also, according to the court order which gave Tommy's parents this discretion, Chayla is not allowed to see the child. The couple divorced on June 14, 2001 (two weeks before the deprivation hearing in the present matter).
In January 1998, Chayla's second child, C.W., was born, the result of an alleged rape by a different man. In April 1999, Chayla's third child, K.W., was born as a result of a relationship with a man named C.P. At some point, DFACS was concerned that Chayla was not properly providing for K.W.'s nutritional needs. Sometime thereafter, Chayla voluntarily relinquished custody of these two children to her mother and stepfather because of her unstable living conditions and because she did not have the resources to take care of them. Chayla's mother and stepfather now have permanent custody. Chayla sees these children "once in a while" or "twice a month," but only according to her mother's and stepfather's wishes. As of July 2001, Chayla did not object to her mother continuing to have custody of the two children. Although she hoped to regain custody one day, Chayla has failed to pay court-ordered support payments regarding these children and has never brought clothes to them.
Sometime later, Chayla began a relationship with James W. (no relation to Tommy W.), and as a result, J.T.W., the subject of the present case, was born on December 26, 2000, while Chayla was still married to Tommy. The child was diagnosed with breathing problems, and Chayla learned CPR before leaving the hospital and also learned how to use a breathing monitor.
Chayla's relationship with James W. included one or two incidents of violence. In February 2001, James broke her nose with a telephone after she asked him whether he had a girlfriend; J.T.W. was not present, and the incident occurred away from the child's home. Chayla testified that this was the only incident of violence between the two, but there is evidence of another incident in April 2001.

DFACS Becomes Involved with J.T.W.
On February 19, 2001, Chayla called DFACS and advised that J.T.W. had a serious medical problem and that James's parents, with whom she lived, prevented her *62 from using the telephone. James's parents also would not let their son, the child's natural father, have contact with the family.
Audrey Williams, the Worth County DFACS social services case manager, met with Chayla and learned that the child had a condition called "central apnea," which caused the baby to stop breathing at times and which required the child to use a breathing monitor. She also learned that James's parents did not want James present because he had physically abused Chayla, including the broken nose incident. Chayla agreed to allow no further contact between James and the child.
During the next month, Williams learned that Chayla failed to take the child to a follow-up medical appointment on February 15 due to lack of transportation. Williams told Chayla that the child should not miss any more appointments and that she would provide transportation herself if necessary. But in early March 2001, Chayla missed another appointment and explained that she had decided to change pediatricians. Williams warned that further missed appointments would be considered a serious concern for DFACS. Chayla finally took the child to a new pediatrician, Dr. Grace Davis, on March 6. Chayla related, in the doctor's words, "a very good [medical] history" of the child, including that the child had been diagnosed with apnea as well as gastroesophageal reflux disease, and the child was on medication and used an apnea monitor at home.
On March 16, Chayla brought J.T.W. back to Dr. Davis because the child was not breathing properly and because Chayla had suctioned the child's nose because of congestion, which caused some bleeding. She had to ask for a ride from a friend because she did not have a vehicle. Dr. Davis noted that the child was cyanotic: "he was blue"; and she performed an oxygen test but no other tests on the child at that time. The doctor also was concerned that the child might have a congenital heart disease. But Dr. Davis did not observe any indication that Chayla had failed to do anything that she had been instructed to do in caring for the child. She instructed Chayla to immediately take the child to Phoebe Putney Hospital for admission that day. Despite the fact that Dr. Davis wanted the child placed on oxygen, she testified that the child "was alert, he was not in any distress.... I did not feel that it was warranted to have an ambulance take him to the hospital ...," and "he was getting by and doing okay." Her records do not indicate the time of the visit but she believes that Chayla arrived just before 2:00 p.m., and she wrote the order to admit the child at 2:45 p.m.
Dr. Davis did not see the mother and child again until that evening at the hospital, but at some point, she called the hospital and learned that the child was not yet there. Between 2:30 and 2:45 p.m., Dr. Davis called DFACS, and related that the child's apnea was a serious, life-threatening matter and that she was not sure that Chayla understood that. The doctor also explained that she had advised Chayla to immediately take the baby to the hospital.
DFACS attempted to contact Chayla by telephone, which eventually caused Chayla to call back at about 4:00 p.m. Chayla admits that she initially did not tell DFACS where she was. She had been waiting at a beauty parlor next door to Dr. Davis's office for the person who gave her a ride to come back and pick her up to go to the hospital. DFACS then picked up Chayla and J.T.W. and took them to the hospital. The child was still blue. At the hospital, Chayla was angry, uncooperative and offensive with DFACS, which resulted in her being escorted out of the hospital by security.
Based on the incident that day and Chayla's past history with her other children, DFACS asked for and obtained an intake order for J.T.W. DFACS placed the child in foster care immediately upon his release from the hospital. The child has remained with the same foster parents the entire time. He is doing well medically and is close to the foster parents. The child is not developmentally delayed. Dr. Davis's prognosis for the child was fair to good; a majority of children with reflux get better with time and the child was sent to an apnea specialist in 2001, although the opinion of that specialist does not appear to be in the record. As of July 2003, the child was under only the normal care of a *63 pediatrician, and there is no indication in the record that the child continues to have special medical needs; the Department admits that the child does not. The child is said to be thriving in foster care. No evidence was presented of foster care drift.

Subsequent History
After DFACS took custody of the child, Chayla was instructed that in order to visit with the child, she had to call by the fifth of the month to schedule either one two-hour visit or two one-hour visits each month. DFACS admits that Chayla cooperated with the agency with regard to visits. Between the initial placement and June 1, 2001, she visited the child on a regular basis. She called with questions about her child's health and had many concerns about the foster parents. Between July 2002 and January 2003, Chayla missed some visits with the child when she was sick, "but basically she visited." Between January 2003 and July 2003, in addition to visiting, Chayla called twice a month to check on the child. But during one period, out of a maximum of twelve hours of available visitation time, Chayla only visited five or six hours. Chayla testified that during her pregnancy with her fifth child she missed some visits, and that she was sick on other occasions. Testimony was presented that although his bond with his mother is no greater than with other people whom he knows, J.T.W. warms up well to Chayla during the visits.
With regard to support payments, DFACS acknowledged that as a result of Chayla's pregnancy and other medical conditions, she was not required to make any payments before July 2003, the month of the final hearing. But there was evidence that Chayla never took a gift, clothing, or money to the child. And a parent "has a statutory duty to support her children, with or without a court order." In the Interest of R.W., 248 Ga.App. 522, 526, 546 S.E.2d 882 (2001).
Chayla finally divorced Tommy in June 2001. She ended her three-year relationship with James shortly before the deprivation hearing in July 2001. At that hearing she claimed no relationship with James and did not plan on having one. She then married someone else in the fall of 2001 shortly before the November 2001 termination hearing. Although the court denied termination in part because of that marriage, it did not last. She later resumed her relationship with James, and on May 9, 2003, shortly before the second termination hearing regarding J.T.W., Chayla and James were married.
Just prior to their wedding, from February through April 2003, Chayla and James lived together in Milledgeville and kept her two middle children, then ages five and four, with the consent of her mother and stepfather, as a test of her ability to care for the children. During that time, according to Chayla's stepfather, Chayla did fine with the children: "She did real good." Then, on April 27, 2003, Chayla gave birth to a second child fathered by James. (Chayla takes her baby when she visits J.T.W.) Chayla and James then moved in with James's mother, which caused Chayla's mother and stepfather to take the two older children back because they had not given permission for Chayla to move there with the children.
The couple's residence with James's mother is also a concern for DFACS. James's mother and Chayla had physical altercations in 1999 and 2001. One incident resulted in James's mother going to jail. Also, at the time of the deprivation hearing, Chayla indicated that she had been forced to leave the home because of sexual abuse by James's brother and father. But at the time of the second termination hearing, she again lived with James's mother. (James's father had died by that time.) James's mother invited a new boyfriend to live with her beginning only three weeks before the July 2003 termination hearing regarding J.T.W., and they planned to get married. The boyfriend is disabled and does not work. Finally, in separate matters, James has lost custody of his three other children from other relationships.

Instability
There is no question that Chayla has led an unstable life for several years, with three marriages and other relationships; several jobs and periods of unemployment; and ten or twelve residences including hotels, a homeless shelter and, on one night, a car. She had moved three times in the year before *64 the second termination hearing. Although she had some legitimate job prospects as a photographer at the time of that hearing, she had not been employed in the prior six months, and she had lined up only a job as a cashier at a fast food restaurant, which was supposed to start the week following the hearing. She married James two months before the second termination hearing, and he has a job that nets between $300 and $400 a week.
Chayla has a car, she does not have to pay rent, she claims to have child care arranged, but she has no medical insurance. She has completed her GED classes but has not taken the test. She completed a six-week parenting class in February 2003, although her classes were originally scheduled to begin in December 2001. She claims a good relationship with her husband. She plans to live with her mother-in-law for the time being to make sure that her mother-in-law is taken care of.

Opinions about the Mother
In July 2001 at the deprivation hearing, DFACS explained that it asked for nonreunification because:
There's extensive history, not only with Worth County DFACS, but with three other agencies of the same type of allegations, confirmed reports of instability, medical neglect to her other children, lack of supervision. These same concerns exist today. She has a failed previous case plan with the oldest child,..., in Colquitt County. He entered foster care at 16 months of age due to his parents not following up with his medical needs, being taken from one caregiver to another and threats of injury directed from one parent to another parent. Custody of this child was awarded to the paternal grandparents on May the 15th of '99.
Chayla has two other children that her mother has custody of. Chayla willingly placed these children with her mother. Her mother [then] sought a court order to obtain custody of the children.
DFACS also offered the opinion of Boyd Anderson, a self-described neutral party who investigates family situations in order to provide recommendations to DFACS. He testified that Chayla was cooperative, forthcoming, presented herself well, and interacted well; that there was "quite a bit" of family support for the child; that the family loved the child; and that Chayla has employment skills. But he also testified that Chayla had problems, including that she had emotional problems with her mother and that she was concrete in her thinking. For instance, she did not see how the situations involving her other children related to J.T.W.'s situation. He recommended that reunification should only happen if Chayla demonstrated and maintained emotional stability, maturity, and financial means sufficient to provide for J.T.W.'s medical, physical, and emotional needs.
In 2003, at the second termination hearing, Holly Hutchinson, the then-current caseworker, explained that in her opinion termination was warranted based on a conclusion that the mother could not care for the child financially, emotionally, or physically. She added that Chayla may have medical problems that could affect her ability to parent, but no supporting evidence was given. Although adoption was the plan, the Department had not identified any suitable relatives with whom to place the child.
But the evidence also shows that Hutchinson had never visited Chayla's home, she had never discussed with Chayla the idea that she needed to maintain a stable home, she did not know whether the child still had apnea or still required breathing treatments, and she claimed no knowledge of the source of Chayla's support or transportation. Furthermore, a home evaluation performed in connection with Chayla's fifth child concluded that there was no reason to remove the baby. And the testimony at the second termination hearing showed that J.T.W. warms up well to Chayla during the visits. Finally, the juvenile court had this exchange with Hutchinson:
The Court: Based on your involvement in the case and your knowledge of J.T.[W.], of his mother and her situation, do you think it would be detrimental to that child for him to continue to have future contact with his mother?
*65 Answer: `Detrimental, no.'
Chayla's stepfather offered his opinion that she is not able to provide for the needs of her children. He testified that he would be "scared" of having the children stay with Chayla and James if he could not check on them daily. When the juvenile court judge asked for specifics, he replied, "She'll abandon her kids for a man in a heartbeat. She puts a man first...." He added that she has confused the children by having them call three or more of her boyfriends "daddy."
On the other hand, Chayla's mother-in-law, with whom she was living, testified that she had no concerns about Chayla raising the child, that she trusted Chayla, and was confident that Chayla had the ability to protect the children and provide for their needs.
At the time of the deprivation hearing in 2001, Chayla admitted that she could not provide for the child herself, and she agreed that DFACS should have temporary custody. At the termination hearing in 2003, she testified that she had changed in several ways and that she could take care of the child. She said that in order to get her child back, she would keep a job and maintain and keep a home. She testified that she now has a good marriage with James, that he has a job that pays $300 to $400 a week, that the two understand the significance of leading a stable life, that they live in a five-bedroom house with her in-laws, and that she loves her children. She blames her lack of bringing gifts and money on the fact that the case was slated for termination.
2. Before terminating a parent's rights, a juvenile court must employ a two-step test:
First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.
(Footnote omitted.) In the Interest of T.B., 249 Ga.App. at 285-286(1), 548 S.E.2d 45 (2001).
(a) Based on the evidence presented at the July 2001 deprivation hearing, the court found that (1) the child had special needs, (2) the mother had failed to promptly address those needs, (3) she had unstable living arrangements and unstable employment, (4) she had no transportation, (5) she was unable to meet the child's basic needs, (6) she had a history of deprivation with other children, (7) she had failed to meet a previous case plan in connection with her oldest child, and (8) she had a history of domestic violence with Tommy and with James.
Based on evidence presented at the November 2001 termination hearing, although the court denied termination, it reiterated that the child was deprived because of the above reasons and these additional reasons: (9) the mother failed to object to a custody order regarding her middle two children, (10) she failed to maintain contact with her oldest child and had taken no steps to have custody returned, (11) she continued to have unstable living arrangements and employment, and (12) she failed to make court-ordered child support payments. The juvenile court concluded that the child had special needs and that Chayla lacked the ability "to provide for the physical, mental, emotional, and moral conditions and needs of the child." See OCGA § 15-11-2(8)(A).
Chayla never appealed either of these two orders. "Therefore, [Chayla is] bound by this finding of deprivation and the first factor is satisfied." (Citations and punctuation omitted.) In the Interest of M.E.C., 228 Ga.App. 9, 10(1)(a), 491 S.E.2d 107 (1997).
(b) In determining whether lack of proper parental care or control caused the deprivation, among other things, the court must consider past or present evidence of physical, mental, or emotional neglect of the child or of another child by the parent. *66 OCGA § 15-11-94(b)(4)(B)(v). Here, the department introduced clear and convincing evidence that Chayla failed to provide proper parental care and control of her first child by allowing domestic violence in the home and by failing to provide for the child's medical needs. The evidence also showed that Chayla was unable to provide a stable home for her second and third children and that she admittedly lacked the resources to care for them. As a consequence of her behavior, Chayla has lost custody of these three children. The Department also introduced evidence to show that Chayla was less than diligent in caring for J.T.W.'s medical needs. She missed two of his appointments, and was dilatory taking J.T.W. to the hospital after being instructed to do so immediately by the doctor. She also admitted, at the time of the deprivation hearing, that she could not provide for the child. She continues to live an unstable life characterized by numerous moves, unstable employment, and relationships involving domestic violence. Sufficient evidence was presented to support a finding that a lack of proper parental care or control caused the deprivation found in this case.
(c) The third criterion requires proof that the cause of the deprivation is likely to continue. "[Ev]idence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in her natural child; clear and convincing evidence of present unfitness is required." (Citations and punctuation omitted; emphasis in original.) In the Interest of K.M., 240 Ga.App. 677, 680, 523 S.E.2d 640 (1999). "But the trial court is entitled to consider evidence of the mother's past actions in determining whether the deprivation is likely to continue. It is not bound by mere promises to do better in the future." (Citations omitted.) In the Interest of A.M., 259 Ga.App. 537, 542, 578 S.E.2d 226 (2003).
In this case, despite the nonreunification case plan, the juvenile court essentially gave Chayla a second chance to show that she could be a proper parent for the child. On March 28, 2002, the juvenile court denied the Department's first petition to terminate Chayla's parental rights. The court reasoned,
[T]his Court is unable to hold at this time that the natural mother will be unable to provide for the needs and welfare of [J.T.W.] in the future and finds that a termination decision as to this child would be premature considering the steps the mother has taken to stabilize her life in the recent past and the relatively young age of the child.
The natural mother has made recent changes in her life in the areas of housing, economics, and marriage....
Eighteen months later, following a hearing on the Department's second petition to terminate Chayla's parental rights, the court found that Chayla was unable to change the patterns of her behavior. The court noted that Chayla had gotten divorced and remarried in the interim and that her new marriage, like the former, had taken place just prior to a hearing regarding the child. The court found that Chayla had not had stable employment or housing in between the two marriages. And, she had made no further attempts to regain custody of her other children. The court concluded, "[Chayla] has not made the necessary changes in her life in the areas of housing, economics, and marriage."
The evidence supported these findings. With regard to housing and economics, the evidence showed that Chayla's life continued to be characterized by numerous moves, changing mates, and uncertain sources of income. With regard to marriage, the evidence shows that Chayla had elected to marry James, who had physically abused her in the past and whose parental rights to J.T.W. have been terminated. James had never legitimated J.T.W. or paid any support for the child before his rights were terminated, nor had he contacted DFACS to inquire about the child after his rights were terminated. Although Chayla contends that her husband is able to support the family, Chayla has a pattern of short-term relationships and has shown no ability to provide for her children in the absence of help from a spouse or other family members. Although Chayla claims that she is now prepared to do better, the decision as to a child's future must be based on more than positive promises that are contrary *67 to negative past fact. In the Interest of T.W., 255 Ga.App. 674, 677(2), 566 S.E.2d 405 (2002).
Construing the evidence in favor of the Department, we cannot say that the court erred by finding that some aspects of Chayla's deprivation of J.T.W. were likely to continue. These include her apparent inability to create a stable home environment and to select long-term partners whose presence is beneficial to the child and who do not engage in domestic violence.
But there was no evidence to support the court's finding that the child continued to have special medical needs or that Chayla was unable to care for the child's normal medical needs. Likewise, there was no evidence that she was incapable of caring for and providing the basic economic needs to her most recent child, J.T.W.'s younger sibling; a Department investigation concluded as much. With regard to basic support, the only evidence was that Chayla's husband made $300 to $400 a week, and no evidence was presented to show that this was insufficient to cover the family's expenses. See In re C.F., 266 Ga.App. 325, 596 S.E.2d 781 (2004). The evidence showed that the couple was financially stable, lived in appropriate housing, had transportation, and that there was "quite a bit" of family support for the child. Finally, the evidence shows that Chayla visited the child fairly regularly, called about him on other occasions, and had completed a parenting course even though the Department's plan called for nonreunification.
(d) The fourth question is whether the evidence shows that continued deprivation of the type supported by the evidence is likely to cause serious physical, mental, emotional, or moral harm to the child. OCGA § 15-11-94(b)(4)(A)(iv). Although this is a difficult case, we find insufficient evidence to support the trial court's conclusion that continued deprivation as described above is likely to cause serious harm to the child.
At the final termination hearing, in response to a direct question from the juvenile court judge toward the end of her testimony, the assigned caseworker gave her opinion that continued contact between the mother and child would not have a detrimental impact on the child. See, e.g., In the Interest of J.M., 251 Ga.App. 380, 383(4), 554 S.E.2d 533 (2001) (no testimony that the children would be seriously affected by the mother continuing to have a parental relationship with the child); In the Interest of K.J., 226 Ga.App. 303, 309(2)(b), 486 S.E.2d 899 (1997) (neither caseworker testified that the children were likely to suffer serious harm if parental rights were not terminated, nor was there expert testimony on point). Furthermore, no evidence was presented that Chayla had deprived J.T.W.'s younger sibling or caused any serious harm to J.T.W. while the child was in her care. Also, J.T.W. warms up well to Chayla during the visits. Although the court was concerned about past domestic violence, no evidence was presented that the past violence occurred in the child's presence, that it affected the child, or that the child was at risk of harm as a result.
The court's only directly relevant finding is flawed for the same reason.
This Court finds that it would be detrimental for [J.T.W.] to have continued contact with [Chayla] because [she] has consistently shown and admitted that she cannot provide for the needs of this child. In addition, due to all of the circumstances involved, the natural mother can not provide for the physical, mental, moral or emotional needs of the child.
There is simply no evidence to show that Chayla's continuing parental weaknesses, as described above, will seriously harm the child. Indeed, she was caring for another child and DFACS had not decided that that child was in any kind of danger.
We note here that this Court has previously held that the same evidence used to support a finding that the cause of the deprivation is likely to continue may support a finding that continued deprivation would cause serious physical, mental, or moral harm to the children. See In the Interest of S.L.B., 265 Ga.App. 684, 688, 595 S.E.2d 370 (2004); In the Interest of K.L., 234 Ga.App. 719, 722, 507 S.E.2d 542 (1998). We stop here to stress that caution should be used when applying this rule to make sure that *68 the facts support the finding. In other words, it is not automatically true that a finding that deprivation is likely to continue will support a finding that continued deprivation will harm the child. Otherwise, the fourth part of the test would have no meaning.[1]
In this case, we conclude that a rational trier of fact could not find that the same facts that show continued deprivation also show that continued deprivation will lead to serious harm to the child. It is not obvious that continued exposure to a mother who has difficulty establishing a stable home environment and who has poor judgment selecting a partner will cause serious physical, mental, or moral harm to the child. For instance, this Court has held that "the fact that a mother is unemployed, without prospects for future employment, and without any stable living arrangements is not sufficient to terminate parental rights. [Cits.]" (Punctuation omitted.) In the Interest of M.M., 263 Ga.App. 353, 359, 587 S.E.2d 825 (2003). Nor is it obvious that the past incidents of domestic abuse between the mother and her husband and mother-in-law had a serious effect on the child or will have a serious effect in the future. See generally In the Interest of J.M., 251 Ga.App. 380, 554 S.E.2d 533 (2001) (past history of domestic violence noted in decision reversing termination of parental rights).
Only under compelling circumstances found to exist by clear and convincing proof may a court sever the parent-child custodial relationship. In the Interest of E.M., 264 Ga.App. 277, 278, 590 S.E.2d 241 (2003).
Judgment reversed.
RUFFIN, P.J., and ELDRIDGE, J., concur.
NOTES
[1] We also note the questionable origin of this rule. The above rule was first stated in a pair of cases issued in 1998. See In the Interest of K.S.W., 233 Ga.App. 144, 503 S.E.2d 376 (1998); In the Interest of K.L., 234 Ga.App. at 719, 507 S.E.2d 542 (1998). Both cases state the rule essentially as follows:

The same circumstances that authorized the juvenile court's determination that these children were deprived due to lack of proper parental control or to parental inability and that such deprivation was likely to continue further provided clear and convincing evidentiary support for the conclusion that such continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the children.
K.S.W., 233 Ga.App. at 149(3), 503 S.E.2d 376. See also K.L., 234 Ga.App. at 722, 507 S.E.2d 542. Both cases cite the same case in support of the proposition: In the Interest of D.T., 221 Ga.App. 328, 471 S.E.2d 281 (1996). The reasoning of that case is difficult to follow yet it clearly relies on a similar but in fact very different rule: one that allows a trial court to base a decision regarding the best interests of the child on the same evidence used to support findings on the four sub-parts of the first step of the larger two-part test applicable to termination cases:
The same factors which show the existence of parental misconduct or inability, such as appellant's repeated inability in the case sub judice to overcome her drug addiction, with its consequent incarceration and loss of employment, can also support a finding that the termination of parental rights is in the best interests of the child.
(Emphasis supplied.) Id. at 329(1), 471 S.E.2d 281. See also In the Interest of S.L.B., 214 Ga.App. 802, 805, 449 S.E.2d 334 (1994) (upon which D.T. relies for the same rule).