645 S.E.2d 724 (2007)
In the Interest of S.S.G.A. et al., children.
In the Interest of Q.P.A., a child.
Nos. A07A0285, A07A0286.
Court of Appeals of Georgia.
May 8, 2007.
David Joseph Koontz, Marietta, David Paul Smith, Atlanta, for appellant (case no. A07A0285).
Roderick Haines Martin, Marietta, for appellant (case no. A07A0286).
*725 Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Elizabeth M. Williamson, Assistant Attorney General, Sanders Buie Deen, for appellee.
BERNES, Judge.
In these companion cases, the natural mother of S.S.G.A., T.M.J.A. and Q.P.A. and the putative father of Q.P.A. appeal the juvenile court's order terminating their parental rights. Both appellants contend that the evidence was insufficient to support the juvenile court's findings. The appellant father also contends that the juvenile court erred in denying his motion for continuance. For the reasons that follow, we affirm in both cases.
On appeal, we must determine whether, after reviewing the evidence in a light most favorable to the lower court's judgments, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. This Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the [juvenile] court's fact-finding and affirm unless the appellate standard is not met.
(Citation omitted.) In the Interest of T.A.M., 280 Ga.App. 494, 495, 634 S.E.2d 456 (2006).
So viewed, the record shows that the mother has a long history of mental health and drug abuse issues. Her Department of Family and Children Services ("Department") records date back to 1991. She gave birth to S.S.G.A. in August 1996. In 2003, S.S.G.A. underwent a psychological examination after which she was diagnosed with attention deficit hyperactivity disorder ("ADHD"). The examining doctor recommended intense counseling for S.S.G.A., further evaluation of S.S.G.A. by a psychiatrist, family counseling and parental training for the mother.
Thereafter, the Department learned that the mother was not maintaining consistent mental health treatment and stable housing for S.S.G.A. and that the child was not attending school regularly. In June 2004, the mother voluntarily agreed to place S.S.G.A. in the custody of her putative father and two months later, she consented to a deprivation finding by the juvenile court. The Department subsequently discovered that S.S.G.A.'s putative father had an extensive criminal history, had failed a drug test, and had failed to maintain counseling for S.S.G.A. Consequently, S.S.G.A. was removed from her putative father's home and placed in foster care.
In August 2004, the mother gave birth to T.M.J.A. Both the mother and the newborn child tested positive for amphetamines. In October 2004, the juvenile court found T.M.J.A. to be deprived based on the positive drug tests, the mother's history of drug abuse and mental illness, the mother's history of deprivation with regard to S.S.G.A., and the mother's refusal to cooperate with the caseworker in drug screenings. The Department was given temporary custody of T.M.J.A. He was later placed in the temporary custody of his alleged putative father. Temporary custody of T.M.J.A. was transferred back to the Department after the alleged putative father failed to follow through with paternity testing, failed to legitimate the child, and failed to attend a court hearing. The mother subsequently claimed that another individual was the putative father of T.M.J.A.
In January 2005, the mother was arrested for possession of marijuana and methamphetamine. In February 2005, a citizens review panel issued a finding that the mother had not accomplished any of her goals for reunification and recommended termination of parental rights and adoption of the children. In April 2005, the mother, who was then pregnant with Q.P.A., was again arrested for possession of methamphetamine. Shortly thereafter, the Department petitioned to terminate the mother's rights to S.S.G.A. and T.M.J.A. In June 2005, the mother entered a guilty plea to charges arising from her January and April 2005 arrests and was sentenced to a lengthy period of probation.
In September 2005, the mother gave birth to Q.P.A. The appellant father was named as the putative father of Q.P.A. Based upon the mother's history of drug abuse, homelessness, instability, and deprivation of S.S.G.A. and T.M.J.A., the juvenile court granted immediate temporary custody of Q.P.A. to the Department. On October 4, 2005, both appellants consented to findings that Q.P.A. was deprived based upon the *726 mother's history of depriving S.S.G.A. and T.M.J.A. and the appellant father's incarceration. That same day, the Department petitioned to terminate appellants' parental rights to Q.P.A.
The court appointed special advocate ("CASA") and guardian ad litem submitted reports detailing the mother's history of drug abuse, mental illness, homelessness, and instability; the appellant father's incarceration and history of substance abuse and drug charges; both appellants' failure to bond and to provide for the children; and the children's improvement, support, and bonding in their foster home. The CASA and guardian ad litem also recommended termination of appellants' parental rights to allow for the children's adoption.
During the termination proceedings, the putative fathers of S.S.G.A. and T.M.J.A. consented to termination of their parental rights. The appellant father filed a motion for funds for paternity testing and a petition to legitimate Q.P.A.
By the time of the termination hearing, both appellants were incarcerated on drug charges. The mother was also facing a revocation of her probation. They were transported from jail to attend the hearing and were represented by counsel. The appellant father requested a continuance from the termination hearing so that he could complete paternity testing and determine whether he was Q.P.A.'s biological father. The motion for continuance was denied. Following the evidentiary hearing, the juvenile court entered orders terminating appellants' parental rights.
Before terminating a parent's rights, a juvenile court must employ a two-prong test.
In the first prong, the court must decide whether there is present clear and convincing evidence of parental misconduct or inability. OCGA § 15-11-94(a). Parental misconduct or inability, in turn, is proven by evidence showing: (1) that the child is deprived; (2) that lack of proper parental care or control is the cause of deprivation; (3) that the cause of deprivation is likely to continue or will not likely be remedied; and (4) that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. OCGA § 15-11-94(b)(4)(A). In the second prong of the termination test, the juvenile court must consider whether termination of parental rights would be in the best interest of the child.
(Citation, punctuation and footnote omitted.) In the Interest of R.W., 248 Ga.App. 522, 523-524(1), 546 S.E.2d 882 (2001).

Case No. A07A0285
1. In this case, the mother challenges only the juvenile court's finding that the cause of the deprivation was likely to continue or will not likely be remedied. We find no error.
The evidence shows that the mother had a history, dating back to 1991, which required intervention by the Department. The mother admitted that she is a drug addict. She used drugs while she was pregnant with T.M.J.A., and both she and T.M.J.A. tested positive for drugs at the time of his birth. After S.S.G.A. and T.M.J.A. had already been placed in the Department's custody and while the mother was pregnant with Q.P.A., she continued to use drugs.
The mother had been incarcerated and convicted on criminal drug charges and was presently incarcerated on a drug charge at the time of the termination hearing. She had been refused entry into a drug program because of her continued drug abuse and had previously failed to complete a drug treatment program at the Cobb County Health Department.
The mother also failed to comply with her case plan goals for reunification both before and during her incarceration; had a ten-year gap in employment; had no permanent residence; stopped receiving treatment for her mental health issues; did not regularly attend scheduled visits with the children; and did not pay any child support while the children were in foster care.[1] Even when the mother faced the likelihood of losing parental rights to her children, she continued to abuse *727 drugs and engage in irresponsible behavior leading to her incarceration.
"[T]he trial court is entitled to consider evidence of the mother's past actions in determining whether the deprivation is likely to continue." (Citation and punctuation omitted.) In the Interest of J.T.W., 270 Ga. App. 26, 34(2)(c), 606 S.E.2d 59 (2004).[2] "[The mother's] past and current criminal incarcerations evidence a patent disregard for the [children's] welfare and that the pattern of deprivation is likely to continue." (Citation and punctuation omitted.) In the Interest of J.K., 239 Ga.App. 142, 146(1), 520 S.E.2d 19 (1999). See also In the Interest of A.R.G.B., 251 Ga.App. 673, 674(4), 555 S.E.2d 42 (2001). "Although [the mother] claims that she is now prepared to do better, the decision as to a child's future must be based on more than positive promises that are contrary to negative past fact." (Citation omitted.) In the Interest of J.T.W., 270 Ga.App. at 35(2)(c), 606 S.E.2d 59. The mother had more than ample time to rehabilitate herself. Her children should not be required to linger indefinitely in foster care. "Based on the evidence of [the mother's] past behavior and the length of time the problem had existed, . . . a rational factfinder could have found by clear and convincing evidence that the conditions of [the children's] deprivation were likely to continue." In Interest of J.M.C., 201 Ga.App. 173, 174-75, 410 S.E.2d 368 (1991).

Case No. A07A0286
The father of Q.P.A. also appeals, contending that the juvenile court erred in its ruling of deprivation and termination of his parental rights and erred in denying his motion for continuance to complete paternity testing. We find no error and affirm.
2. The father contends that the evidence does not support the court's ruling that Q.P.A.'s deprivation was likely to continue, and that termination of his parental rights was in the best interests of the child.[3] We disagree.
The father and mother stand on practically equal footing and present nearly identical circumstances in evaluating their parental ability. The father, like the mother, has had a long history of chronic, unrehabilitated drug abuse and several arrests and convictions for drug charges. In 1984, the father was convicted of possession of marijuana. In 1987, he was convicted of selling cocaine and as a result served significant time in prison. The father had previously completed a drug rehabilitation program, but contended he relapsed into drug usage about two years ago.
He and the mother were arrested together on drug charges in January 2005. He was arrested again on drug charges in May 2005 and was incarcerated when Q.P.A. was born in September 2005. At the time of the termination hearing, he was serving a prison sentence. The father had been informed by the mother that he was Q.P.A.'s biological father in May 2005. However, he has never had any physical contact with Q.P.A., has never paid any child support, and at the time of the hearing recognized that he had no ability to meet any of the child's needs.
"Clearly, the fact that appellant has had no contact with his son is a demonstrable negative effect." In the Interest of S.R.B., 270 Ga.App. 466, 470(4), 606 S.E.2d 655 (2004). And, the father's history of chronic, unrehabilitated drug abuse problems and incarcerations for repeated offenses constitute aggravating circumstances that supports the termination of his parental rights. In the Interest of M.D.F., 270 Ga.App. 460, 465, 606 S.E.2d 658 (2004); In the Interest of J.M.C., 201 Ga.App. at 174, 410 S.E.2d 368. The *728 father's further failure to provide for the care and support of the child also provided the juvenile court with clear and convincing evidence authorizing its decision to terminate the father's parental rights. In the Interest of M.D.F., 270 Ga.App. at 465, 606 S.E.2d 658; In the Interest of A.R.G.B., 251 Ga.App. at 674(4), 555 S.E.2d 42; In the Interest of J.K., 239 Ga.App. 142, 146(1), 520 S.E.2d 19; In the Interest of J.M.D., 221 Ga.App. 556, 558, 472 S.E.2d 123 (1996); In the Interest of J.M.C., 201 Ga.App. at 174, 410 S.E.2d 368. Although the father contends that he would soon be eligible for parole and that the Department could monitor his behavior after his release, the court "[was] not obligated to gamble [Q.P.A.'s] prospects for a good life on the possibility that the [father] will emerge from prison . . . reformed to the point that [he] can take care of [Q.P.A.] and provide him with a stable home." In the Interest of M.N.L., 221 Ga.App. 123, 125(3), 470 S.E.2d 753 (1996).
3. The father also contends that the juvenile court erred in denying his motion for continuance. The father sought a continuance from the specially set and duly noticed hearing so that he could obtain the results of a paternity test.[4] The juvenile court denied the motion on the grounds that the evidence as to the father's parental fitness would be the same and unaffected by the paternity test results. The juvenile court further reasoned that the hearing had been specially set for some time, and that the parties had received sufficient opportunity prior to the hearing to complete paternity testing and to obtain any necessary evidence.[5]
"A trial court's decision to grant or to deny a continuance will not be disturbed absent abuse of discretion." (Citation and punctuation omitted.) In the Interest of M.H.W., 275 Ga.App. 586, 591(2), 621 S.E.2d 779 (2005). On appeal, "[t]he appellant must also show that harm resulted from the denial of the continuance." Id. Pretermitting whether the juvenile court initially abused its discretion in failing to grant the continuance so that paternity could be established, the father has failed to show harm from the decision. This is particularly true in light of our holding in Division 2 above affirming the termination of the father's parental rights.
The father nevertheless argues that he would have approached his relationship with Q.P.A. differently had he known he was the child's father. Appellant's claim is speculative and the evidence at the hearing supports a contrary inference. At the termination hearing, the father denied having any other children, until he was confronted with a divorce decree. He then admitted that he had a 12-year-old daughter whom had not visited for over a year and that he was not current in his child support payments for that child. The father neglected that child even though he did not dispute that child's paternity. The juvenile court properly assessed the father's parental misconduct or inability based upon his undisputed past and current incarcerations on drug charges, lack of bonding, and failure to provide for the child, which were circumstances that remained the same despite the results of the paternity test. See, e.g., In the Interest of D.S.P., 233 Ga. App. 346, 348(2), 504 S.E.2d 211 (1998).
Judgment affirmed.
BLACKBURN, P.J., and RUFFIN, J., concur.
NOTES
[1] The mother's claim that no one ordered her to pay child support. However, "[a] parent . . . has a statutory duty to support her children, with or without a court order. OCGA § 19-7-2." In the Interest of R.W., 248 Ga.App. at 526(2), 546 S.E.2d 882.
[2] The mother points out that her history includes an absence of abuse with respect to her two older children, ages eighteen and nineteen. Significantly, those children were not at issue in the proceedings and the evidence showed that they had been residing with their natural father for several years.
[3] The father's enumeration of error alleges that the juvenile court erred in its "ruling of deprivation." In his argument, however, he concedes that the evidence was sufficient to establish deprivation based on his incarceration and argues only the above-stated contentions. We nevertheless note that the father did not appeal and in fact, consented to the trial court's deprivation order finding Q.P.A. deprived based on the father's incarceration. The circumstances existing at the time of the deprivation order, i.e., the father's incarceration, remained the same at the time of the termination hearing. See In the Interest of R.C.M., 284 Ga.App. ___, ___, n. 6, 645 S.E.2d 363 (2007).
[4] Paternity test results later established that the father was Q.P.A.'s biological father based upon a 99.998 percent probability.
[5] At a prior hearing, the juvenile court instructed the father's counsel to promptly pursue his petition to legitimate and request for paternity test, and forewarned that the specially set hearing date would not be delayed.