666 S.E.2d 98 (2008)
In the Interest of J.L.C., a child.
No. A08A0679.
Court of Appeals of Georgia.
July 16, 2008.
*100 Earle J. Duncan III, for appellant.
Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Elizabeth M. Williamson, Assistant Attorney General, James A. Chamberlin Jr., Brunswick, for appellee.
BERNES, Judge.
Following a hearing, the juvenile court terminated the father's parental rights to J.L.C.[1] In his sole enumeration of error, the father contends that the requirements of OCGA § 15-11-94 were not met and thus the trial court erred in terminating his parental rights. For the following reasons, we affirm.
In considering a challenge to the sufficiency of the evidence in a termination of parental rights case, the question is whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. In making that determination, this Court reviews the evidence in a light most favorable to the lower court's judgments and we neither weigh evidence nor determine the credibility of witnesses; rather, we defer to the trial court's fact-finding and affirm unless the appellate standard is not met.
(Citations and punctuation omitted.) In the Interest of R.S., 287 Ga.App. 228, 651 S.E.2d 156 (2007).
So viewed, the record shows that J.L.C. was born on February 3, 2005. At that time, the mother already had five other children, one of whom was the biological child of the father. All of the children had been taken into the custody of the Department of Family and Children Services (DFCS).[2] The father's other child was living with a relative. Immediately after J.L.C.'s birth, she was taken into DFCS's custody based upon allegations of the mother's chronic, unrehabilitated drug abuse, the father's ongoing probation for drug charges and unrehabilitated substance abuse, and the parents' noncompliance with the case plan for the other children. In March 2005, both parents consented to the juvenile court's order finding J.L.C. to be deprived and approving nonreunification in accordance with DFCS's permanency plan.
Although nonreunification had been adopted as the permanency plan, the parents indicated that "[t]hey wanted to work a plan" and asked what steps they needed to take in order to re-unite with J.L.C. In June 2006, the caseworker sent a letter to the parents informing them that they needed to complete six months of clean drug screens, maintain stable housing and employment, and complete a drug and alcohol assessment. Neither parent produced evidence of compliance with the goals indicated in the letter.
In March 2007, DFCS petitioned for the termination of the parents' rights. Among the allegations in the petition were claims that the parents had not obtained adequate housing for the child, had not maintained employment or contributed to the support of the child, had not visited the child, and had a history of chronic, un-rehabilitated use of drugs or alcohol.
At the termination hearing,[3] DFCS presented evidence of the father's un-rehabilitated use of alcohol. The record reflects that the father has received treatment for alcohol abuse on multiple occasions. In 2005, he voluntarily completed substance abuse counseling through the Gateway program. Nevertheless, a family resource center employee who supervised the father's child visitation in 2006 and 2007 testified that the father attended scheduled visits approximately 50 percent of the time and during approximately 40 to 50 percent of those visits, he was drunk.[4] The supervisor testified that at *101 times the odor of alcohol coming from him was so intense that she could not breathe. She stated that his speech was slurred and she could not understand anything he said. She also said that the father was always the one who drove to the visits and she was so concerned about his driving in that condition that she called the police on more than one occasion.
The guardian ad litem testified that she was "gravely concerned" about the father's lack of recovery and continued alcohol use. She stated that during her home visit with the parents, the father talked about his continued consumption of beer, although he claimed that it was sporadic. The guardian ad litem recommended that he obtain treatment and attend daily AA meetings.
The father acknowledged that he learned in substance abuse counseling that he was not supposed to drink alcohol at all. He further admitted that he had not stopped drinking, but claimed that he did not drink as much as he used to. The father admitted that he had not gone to any AA meetings in the past year.
The evidence further reflected that there had been domestic violence between the parents. The mother's probation officer testified that he had observed bruises on the mother's arm. The caseworker testified that on a separate occasion, she also had observed marks on the mother's forehead and back. The father admitted that during one incident, he and the mother "had tussl[ed] a little bit." The evidence further reflected that the mother's clothes were thrown outside of the residence and burned. The father denied that he burned the clothes, but admitted that he had set the mother's clothes outside because he was angry with her.
DFCS also alleged that the father had not maintained employment or provided support for his child. The Department introduced evidence that the father refused to sign the notice on the case plan informing parents that they were required to pay child support. The caseworker testified that under the plan the father was required to submit pay stubs to document that he was employed and he never did so. The caseworker also stated that the father was approximately $3,500 in arrears in child support payments.
According to the father, since 1992, he has worked irregularly doing maintenance work for a real estate broker. He stated that his employment "wasn't an all-the-time thing" and that there were several months when he did not work.
J.L.C. had been in foster care since birth. At the time of the hearing, the child was more than two years old. The caseworker testified that J.L.C. refers to her foster parent as "Mama" and is bonded to the foster parent. The guardian ad litem testified that J.L.C. has also bonded with her foster siblings and that the foster home was "a warm, stable home." The guardian ad litem recommended termination of the father's parental rights.
Based upon the above evidence, the termination of the father's parental rights was authorized. The criteria for terminating parental rights are well established:
First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.
In the Interest of B.T., 291 Ga.App. 604, 607, 662 S.E.2d 656 (2008).
In this case, it has already been established that the child is deprived and that the lack of proper parental care is the cause of the deprivation. The father did not appeal and in fact, consented to the trial court's deprivation order finding J.L.C. deprived due to lack of proper parental care or control. The circumstances of deprivation remained *102 the same at the time of the termination hearing. See In the Interest of B.T., 291 Ga.App. at 607(a), 662 S.E.2d 656; In the Interest of S.S.G.A., 285 Ga.App. 276, 280(2), n. 3, 645 S.E.2d 724 (2007); In the Interest of R.C.M., 284 Ga.App. 791, 798, n. 6 (645 S.E.2d 363) (2007).
In addition to the father's unrehabilitated alcohol abuse, the evidence established that the father failed to maintain stable employment, failed to pay child support,[5] and showed up for his visits with the child only half the time. The evidence further established that there had been domestic violence between the parents, which prevented them from providing a safe, stable home environment.[6] Contrary to the dissent's suggestion, this evidence demonstrated the parental unfitness of the father, irrespective of the mother's conduct. Moreover, the fact that the father had another child who also had been taken into DFCS's custody bolsters the conclusion that he will be unable to support and care for this child. See In the Interest of A.G., 287 Ga.App. 732, 737(1), 652 S.E.2d 616 (2007); In the Interest of S.L.B., 265 Ga.App. 684, 688(1), 595 S.E.2d 370 (2004).[7]
The evidence also demonstrated that the deprivation was likely to continue. "Although past deprivation is not sufficient for termination without a showing of present deprivation, the court can consider a parent's past conduct in determining whether such conditions of deprivation are likely to continue." (Citation, punctuation and footnote omitted.) In the Interest of M.E.M., 272 Ga.App. 451, 454, 612 S.E.2d 612 (2005). This Court has held that it is the juvenile court, not the appellate court, that determines whether a parent's conduct warrants hope of rehabilitation. In the Interest of L.S.D., 243 Ga.App. 626, 628, 534 S.E.2d 109 (2000). We have also held that recent improvements and a few months of partial stability do not negate years of parental misconduct and inability. See id.; In the Interest of J.S., 232 Ga.App. 876, 880, 502 S.E.2d 788 (1998).
While the father claimed that he drank less than he used to in past years, the evidence reflected that he continued to abuse alcohol when he was not supposed to be drinking at all. The father's continued alcohol abuse, failure to have consistent meaningful contact or visits with J.L.C., failure to pay the required support toward her care, failure to maintain stable employment, and physical abuse of the mother, all support the juvenile court's finding that the conditions of deprivation are likely to continue. In the Interest of B.T., 291 Ga.App. at 608(c), 662 S.E.2d 656; In the Interest of D.D.B., 282 Ga.App. 416, 419-420(1), 638 S.E.2d 843 (2006); In the Interest of M.R., 282 Ga.App. 91, 100(1), 637 S.E.2d 743 (2006).
The record also supports the juvenile court's determination that continued deprivation was likely to cause serious harm to the child. J.L.C. has been in foster care since birth. There is no evidence of any parental bond between the father and J.L.C. Moreover, as the juvenile court pointed out, prolonged foster care is harmful to the child.

*103 In assessing harm, a juvenile court may consider the adverse effect of prolonged foster care. It is well established that children need permanence of home and emotional stability or they are likely to suffer serious emotional problems. The same evidence that demonstrates continuing deprivation also may support a determination that such condition will harm the children.
(Citations and punctuation omitted.) In the Interest of A.H., 289 Ga.App. 121, 124(1)(b), 656 S.E.2d 254 (2008). "[The child] should not be required to linger indefinitely in foster care." In the Interest of S.S.G.A., 285 Ga. App. at 279, 645 S.E.2d 724. The evidence set out above, particularly in light of the father's failure to maintain meaningful contact and support for his child, authorized the juvenile court to find that J.L.C. would suffer serious harm if returned to the father.
Finally, the second part of the test for terminating parental rights is to determine whether termination is in the child's best interest, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home. OCGA § 15-11-94(a). In looking at whether termination is in the best interest of the child, the juvenile court can consider the child's need for a secure and stable home, the lack of a bond with the father, and the foster family's wish to adopt her. See In the Interest of B.A., 291 Ga.App. 762, 765(2), 662 S.E.2d 846 (2008).
The evidence below was that the child had been in foster care since birth. There was no evidence that the child had bonded with the father. On the other hand, the child is bonded to the foster parent and refers to her foster parent as "Mama." She has also bonded with her foster siblings. This was sufficient clear and convincing evidence that termination of the father's parental rights was in the best interest of the child. In the Interest of B.A., 291 Ga.App. at 765(2), 662 S.E.2d 846.
As pointed out in the dissent, there were some conflicts in the evidence, but these conflicts were for the trial court to resolve. See In the Interest of R.S., 287 Ga.App. 228, 651 S.E.2d 156. Any rational trier of fact could have found by clear and convincing evidence that the father's rights to custody have been lost.
Judgment affirmed.
BARNES, C.J., BLACKBURN, P.J., ANDREWS and PHIPPS, JJ., concur.
RUFFIN, P.J., and JOHNSON, P.J., dissent.
RUFFIN, Presiding Judge, dissenting.
As we have repeatedly held, "[t]here is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship."[8] Indeed, a government exercises awesome power when it elects to terminate a father's parental rights.[9] Thus, the juvenile court's ruling, terminating such rights, "must be scrutinized deliberately and exercised most cautiously."[10]
This is a case in which one parent  here the mother  is clearly unfit. The father, however, seems to have been unfairly painted with the same brush. As noted by the majority, the child was taken away from both parents at birth based largely upon the mother's history with DFCS.[11] In other words, the father never had any opportunity to establish a relationship with the child. Then DFCS immediately sought nonreunification as its "permanency plan." Although this action may have been warranted, DFCS utterly failed to prove this at the termination hearing. Indeed, the hearing illustrated many of DFCS's own failings.
*104 DFCS petitioned for the termination of both parents' rights in March 2007. Among the allegations in the petition were claims that the parents: (1) had not obtained adequate housing for the child; (2) had not maintained employment or contributed to the support of the child; (3) had not visited the child; and (4) had a history of chronic, unrehabilitated use of drugs or alcohol. A hearing was held on June 26, 2007. Shortly thereafter, however, the judge recused herself, and a second hearing was held on October 19, 2007.
DFCS alleged that the father did not have adequate housing, and the caseworker initially testified that the trailer where he lived did not have a properly closing front door and had a septic tank that was covered only with a thin piece of plywood. At the subsequent hearing, however, she admitted that she had gone to the wrong house and that the father's actual living arrangements were adequate.
According to DFCS's petition, the father had failed to maintain employment or provide any support for his child. This, too, is not entirely text-true as shown by the record. The father testified that, since 1992, he has done contract work for a real estate broker when the work was available and that his employer had deducted child support pursuant to an income deduction order. In fact, an income deduction order was in place, and the employer testified that, for some time, money had been deducted for child support; however, the employer could not recall the amount deducted or when the deductions ceased. Initially, the DFCS caseworker testified that she was unaware that such order was in place. But she conceded that, at some point, the Office of Child Support Enforcement had erroneously closed the case; thus, although the father was apparently in arrears in child support, some of the fault can be attributed to DFCS.
DFCS further alleged that the father had not visited his child. Again, this was inaccurate. The person in charge of supervising visitation testified that the father had attended at least half of all visits, which were scheduled every other week.
Significantly, DFCS alleged that the father had "a history of chronic unrehabilitated use of intoxicating liquors or controlled substances." During the two years J.L.C. was in DFCS's custody, the father took only one drug test, which was negative. According to the caseworker, she requested another drug screen that the father failed to take. The caseworker made the request by leaving a note at what she believed to be the father's house requesting that he undergo the test. But the caseworker subsequently admitted that she had been going to the wrong house, and the father testified that he was unaware of any additional tests requested by DFCS.
The woman who supervised the father's visitation said that he often arrived smelling of alcohol, stumbling, and using slurred speech. However, the father's employer  who had employed the father for over ten years-said that he never knew the father to be intoxicated at work.
At the hearings, DFCS presented evidence purporting to establish a history of domestic violence. Specifically, McIntosh County Sheriff's Department Corporal Shawn Knudson testified that, in May 2007, he responded to a domestic disturbance call during which the mother claimed that the father had arrived home, intoxicated, hit her in the head with a broom stick, threw her to the ground, and attempted to choke her. However, this testimony is hearsay.[12] When Knudson arrived, the father was no longer present, and Knudson never spoke to the father. Later that day, someone burned some of the mother's clothes, which the father had left in a pile outside of the residence.[13] The father was arrested following this incident, but the *105 charges were subsequently dropped.[14] DFCS also presented testimony from the caseworker regarding the mother's complaints that the father was abusive toward her. Again, this testimony constituted hearsay and thus lacked probative value.[15] Notwithstanding the rank hearsay, the trial court noted in its order, terminating the father's parental rights, that "[t]here have been at least three incidents of domestic violence by the father upon the mother since the child came into care in 2005."
Although there was no reunification plan in place, the father voluntarily completed counseling through the Gateway program.[16] According to the father, he learned from treatment that alcohol is a drug and that he should not drink. He nonetheless admitted that he continued to drink beer and "might have one or two beers per week." But he maintained that he did not drink to become intoxicated and that he did not use drugs.
Under the facts  as adduced by the State  I simply do not think that the clear and convincing evidence supports the juvenile court's termination of the father's parental rights.[17] Specifically, I do not believe the evidence supports a finding that the deprivation is likely to continue.[18]
Although a juvenile court may consider a parent's past conduct in determining whether deprivation is likely to continue, "past unfitness, standing alone, is insufficient to terminate the rights of a parent in [his] natural child; clear and convincing evidence of present unfitness is required."[19] In this case, DFCS initially sought termination for multiple reasons, several of which simply did not exist with respect to the father. Contrary to DFCS's assertions, the father did have adequate housing, was employed  at least part time  and visited his child. Moreover, the father completed drug and alcohol counseling notwithstanding the lack of a reunification plan that expressly required him to do so. The father visited J.L.C., and there is no evidence whatsoever that the father behaved inappropriately toward his child. Although there is some evidence that the father drank alcohol  at least once to the point of intoxication  we cannot say that this constitutes evidence of current chronic, unrehabilitated alcohol abuse as found by the juvenile court.
In its order, the trial court characterized the father as violent, but much of the evidence of record to support this characterization was hearsay and thus nonprobative.[20] Specifically, both Knudson's and the case manager's testimony regarding the domestic violence was hearsay. And although the mother testified at the first hearing, she was not questioned about any domestic violence other than the one May 2007 incident. Even then, the mother was not asked whether the event had occurred, but simply whether she had reported the incident to the authorities. Thus, we fail to see sufficient evidence to support the trial court's conclusion that "[t]here have been at least three incidents of domestic violence by the father upon the mother since the child came into care in 2005."
The "[t]ermination of parental rights is a remedy of last resort which can be sustained only when there is clear and convincing evidence that the cause of the deprivation is likely to continue."[21] And here  had competent evidence been presented  this standard *106 may have been met. The problem in this case rests with the failure of DFCS to support the allegations in its petition and the failure of the prosecuting attorney to present sufficient competent evidence. And before we take the draconian step of severing a parent's rights, we should  at a bare minimum  require the State to prove its case. Accordingly, I dissent.
I am authorized to state that Presiding Judge JOHNSON joins in this dissent.
NOTES
[1] The juvenile court also terminated the parental rights of J.L.C.'s mother, and she apparently has not appealed this ruling.
[2] According to a DFCS report, a nonreunification plan was approved with respect to these five children on June 22, 2004.
[3] A hearing was held on June 26, 2007. Shortly thereafter, however, the first trial judge recused herself, and a second hearing was held on October 19, 2007. The record does not reflect that the subsequent trial judge considered any evidence from the first hearing, but rather conducted a de novo evidentiary hearing.
[4] The employee subsequently began operating a substance abuse treatment facility for the Gateway program. She testified that she had studied alcohol and drug addiction and was trained to recognize the signs of intoxication.
[5] The father testified that his weekly salary ranged from $250 to $360 and that he earned a total of $3,000 in the past year. Based upon the weekly and yearly salary that the father reported, he worked no more than three months out of the past year. The father conceded that he spent several months without working. When the father was not working, he had no other income.
[6] The trial court's order reflects that there were at least three incidents of domestic violence by the father upon the mother since the child was taken into care in 2005. But in reciting her verbal findings at the conclusion of the hearing, the trial judge stated that the domestic violence issue was not a major factor in her decision. Some of the evidence presented as to the domestic violence constituted inadmissible hearsay that could not be considered. Nonetheless, the father admitted that he had physically "tussl[ed]" with the mother during one incident. The mother's probation officer and the caseworker both testified that they had observed bruises and marks on the mother's body. The father's admissions combined with the other circumstantial evidence adequately proved that there had been domestic violence between the parents. Significantly, however, even if there had been no evidence of family violence, there was still sufficient evidence to terminate the father's parental rights.
[7] Although the trial court made a vague reference to its belief that the child may have been living with the father again, all of the affirmative testimony at the hearing indicated that the child remained in the custody of the paternal aunt.
[8] (Punctuation omitted.) In the Interest of M.M., 263 Ga.App. 353, 359(1), 587 S.E.2d 825 (2003).
[9] See In the Interest of C.T., 185 Ga.App. 561, 562, 365 S.E.2d 117 (1987).
[10] In the Interest of M.M., supra.
[11] As noted by the majority, the father had one other child with the mother that had been taken into DFCS's custody. However, the trial court indicated that the child  who had been placed with a relative  was living with the father, and there was no suggestion that DFCS was attempting to remove this child from his care.
[12] See Wilbourne v. State, 214 Ga.App. 371, 372-373(1), 448 S.E.2d 37 (1994); In the Interest of H.S., 285 Ga.App. 839, 842, 648 S.E.2d 143 (2007) ("`(I)t is well settled that hearsay lacks probative value, even if unobjected to.'").
[13] DFCS maintains that the mother reported that the father had burned the clothes, but in actuality the deputy testified that the mother said "that she received a phone call stating that her husband. . . was burning" her clothing. However, this double hearsay was clearly inadmissible. See Harper v. State, 152 Ga.App. 689, 690(1), 263 S.E.2d 547 (1979).
[14] The father admitted that he and the mother had "tussl[ed] a little bit," but denied striking the mother with a broom.
[15] See Wilbourne, supra.
[16] The case manager testified that, notwithstanding the lack of a reunification plan, she informed the parents that if they wanted to demonstrate their ability to parent, they needed six months of clean drug screens, stable housing, employment, and to complete an alcohol and drug assessment.
[17] See In the Interest of M.A., 280 Ga.App. 854, 856, 635 S.E.2d 223 (2006).
[18] See id.
[19] (Punctuation omitted; emphasis supplied.) In the Interest of K.D.E., 288 Ga.App. 520, 523-524(1), 654 S.E.2d 651 (2007).
[20] See In the Interest of H.S., supra (hearsay lacks probative value).
[21] (Punctuation omitted.) In the Interest of K.D.E., supra at 526.